**UNITED STATES of America, Appellee,**

**v.**

**Leonard ALESSI, Thomas Carcone, John Colagrande, Ralph Ferrara, Jacob Jesselli, James Margro, Anthony Martelli, and Louis Peraino, a/k/a Lou Perry, Defendants–Appellants.**

**Nos. 1170 to 1172 and 1175 to 1176, Dockets 80–1057 to 80–1064.**

United States Court of Appeals, Second Circuit.

Argued June 9, 1980.

Decided Nov. 6, 1980.

Gary A. Woodfield, New York City, for defendants–appellants Alessi and Margro.

Ralph S. Naden, New York City, for defendant–appellant Carcone.

Arnold E. Wallach, New York City, for defendant–appellant Ferrara.

David S. Gould, New York City, for defendant–appellant Peraino.

Ira London, Brooklyn, N.Y., for defendant–appellant Colagrande.

Peter J. Peluso, New York City, for defendant–appellant Jesselli.

Bert Koehler, III, Sunnyside, N.Y., for defendant–appellant Martelli.

Frank J. Marine, Atty., Dept. of Justice, Washington, D.C. (Edward R. Korman, U. S. Atty., Eastern District of New York, Brooklyn, N.Y., Robert J. Erickson, Atty., Dept. of Justice, Washington, D.C., Kenneth J. McCallion, Sp. Atty., Brooklyn Strike Force, Dept. of Justice, of counsel), for appellee.

Before FRIENDLY and MANSFIELD, Circuit Judges.*

MANSFIELD, Circuit Judge:

The eight appellants, Alessi, Carcone, Colagrande, Ferrara, Jesselli, Margro, Martelli and Peraino, were among 17 individuals[1] indicted in the District Court for the Eastern District of New York on charges of conspiring to use stolen airline credit cards to obtain airline tickets in violation of 15 U.S.C. § 1644(a) (Count One), which makes it unlawful for any person to use or conspire to use a stolen credit card to obtain money, goods, services or anything else of value.[2] Appellants were also charged with conspiring under 18 U.S.C. § 371[3] to violate

---

* Honorable William O. Mehrtens, Senior District Judge for the Southern District of Florida, sitting by designation, participated in this appeal. Judge Mehrtens voted in favor of the disposition herein made, but due to his subsequent illness and death did not have an opportunity to review this opinion. Accordingly the appeal is being disposed of by the other two judges as provided in Second Circuit Rule § 0.14.

1. Co-defendants Fasanelli and Folan were acquitted by the jury of all charges. Six individuals indicted along with the appellants–Casella, Doctor, Koch, Goldenberg, Jenco and Pedicine– pleaded guilty prior to trial. Fugario, also indicted, is a fugitive and has not been tried.

2. Title 15 U.S.C. § 1644(a) provides:
"Whoever knowingly in a transaction affecting interstate or foreign commerce, uses or attempts or conspires to use any counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit card to obtain money, goods, services, or anything else of value which within any one-year period had a value aggregating $1,000 or more . . . shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

3. Title 18 U.S.C. § 371 provides, in pertinent part:
"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

15 U.S.C. § 1644(e)[4], which makes it a crime for a person knowingly to use or sell for interstate or foreign transportation tickets which have been purchased or obtained by use of lost, stolen, or fraudulently obtained credit cards (Count Two). Various appellants were also charged with substantive violations of 15 U.S.C. § 1644(e). All eight were convicted of both conspiracy counts and of related substantive counts after a jury trial before Judge Eugene H. Nickerson.[5] Judgment was entered on February 1, 1980. We affirm.

Viewed most favorably to the Government, the proof showed a scheme, involving numerous persons, to use lost or stolen airline credit cards to obtain airline tickets which would then be sold for cash at prices substantially below their face value. The credit cards were United Air Travel Plan "Q" cards (Q cards), a type of card issued by airlines to certain businesses and their exec-

utives. It permits the holder to make multiple purchases of tickets in any passenger name or names, with no maximum monetary limit.

Typically, the cards were stolen by prostitutes from out–of–town businessmen staying at midtown Manhattan hotels. The prostitutes would then sell the cards to one or more persons ("middlemen") who would use them to obtain airline tickets ordered by others ("retailers"). The orders would have been obtained by the retailers from customers for use on personal travel, to whom the tickets would be sold for cash at discounts ranging from 15% to 60% below the tickets' face value. The tickets would be delivered to the customers shortly before their flights, with payment and delivery often taking place in a car, on the street or in a parking lot. Almost all of the tickets were stamped on their face with the name of the corporation and executive card hold-

4. Title 15 U.S.C. § 1644(e) provides:

"Whoever knowingly receives, conceals, uses, sells, or transports in interstate or foreign commerce one or more tickets for interstate or foreign transportation, which (1) within any one–year period have a value aggregating $500 or more, and (2) have been purchased or obtained with one or more counterfeit, fictitious, altered, forged, lost, stolen, or fraudulently obtained credit cards . . . shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

5. Each of the two conspiracy counts (One and Two) named all defendants, including appellants. The appellants named below were charged in the counts shown with unlawful receipt and sale of airline tickets obtained by use of lost, stolen, or fraudulently obtained Q cards. The defendants, dates, face amount of the tickets, and destinations are alleged as follows:

| COUNT | DEFENDANT | DATE | FACE AMOUNT OF TICKET | DESTINATION |
|---|---|---|---|---|
| 3 | Alessi | 2/17/77 | $1,563 | N.Y.-Philippines round trip |
| 4 | Alessi | 1/4/76 | 1,974 | N.Y.-Uruguay round trip |
| 5 | Carcone | 2/9/78 | 7,693 | N.Y.-Philippines round trip |
| 7 | Colagrande | 7/23/76 | 836 | N.Y.-Puerto Rico round trip |
| 8 | Colagrande | 7/11/77 | 568 | N.Y.-Hawaii round trip |
| 9 | Colagrande | 4/6/77 | 1,498 | N.Y.-Fort Lauderdale round trip |
| 14 | Ferrara | 11/11/76 | 1,480 | N.Y.-Las Vegas round trip |

| COUNT | DEFENDANT | DATE | FACE AMOUNT OF TICKET | DESTINATION |
|---|---|---|---|---|
| 15 | Ferrara | 6/9/77 | 2,016 | N.Y.-Los Angeles |
|  |  |  | 4,971 | N.Y.-Italy round trip |
| 19 | Jesselli | 5/20/76 | 1,434 | N.Y.-Italy round trip |
| 20 | Jesselli | 7/15/77 | 1,066 | N.Y.-Alaska round trip |
| 21 | Jesselli | 8/1/76 | 992 | N.Y.-Santo Domingo round trip |
| 25 | Margro | 8/22/75-2/20/76 | 623 | N.Y.-Fort Lauderdale |
|  |  |  | 235 | N.Y.-Jacksonville round trip |
| 26 | Martelli | 1/1/76-12/19/76 | 194 | N.Y.-Fort Lauderdale |
|  |  |  | 395 | N.Y.-Mexico round trip |
| 29 | Peraino | 8/4/77 | 1,242 | N.Y.-San Francisco round trip |
| 30 | Peraino | 8/28/77 | 3,292 | N.Y.-Australia round trip |
| 31 | Peraino | 8/7/76 | 3,082 | N.Y.-Philippines round trip |

Alessi, Colagrande and Ferrara were each sentenced to two years and eight months imprisonment to be served concurrently on each of the counts of which they were convicted. Jesselli was sentenced to two years imprisonment to be served concurrently. Margro was sentenced to two years imprisonment to be served concurrently, 60 days of which was to be served in confinement and the balance suspended, with probation for five years. Peraino was sentenced to two years imprisonment to be served concurrently, of which 60 days would be served in confinement and the balance suspended, with two years probation. Martelli was sentenced to two years imprisonment, of which three months would be served in confinement and the balance suspended, with probation for five years.

er, and showed that they had been purchased with Q cards. Almost all the thefts, the wholesaling and the retailing activities occurred within the mid–town Manhattan area.

The scheme depended for its success on a steady flow of recently stolen or lost cards, since a stolen or lost card may be successfully used for only a short time to unlawfully obtain tickets from airlines. Soon the card may be invalidated and, in addition, delay exposes the user to greater risk of discovery and apprehension. Moreover, to achieve the maximum utilization of each stolen card for volume purchases of tickets it is important to have a number of middlemen and retailers so that each, by communication and interchange of recently stolen cards with others in the group, can take or place orders which will be executed by using a freshly stolen card. The cash payments involved amounted to thousands of dollars for airline trips to many parts of the world.

Various businessmen testified that they missed their Q cards after being jostled or solicited by prostitutes. One prostitute stole at least 300 Q cards during the period of the conspiracy and sold them for $125 each to various co–defendants (Casella, Fugario, Goldenberg). The record shows that, in addition to these persons, appellant Colagrande and other co–conspirators purchased lost or stolen cards. Appellant Ferrara met with defendant Fugario at a luncheonette where Fugario bought stolen credit cards from prostitutes. Defendants Casella and Doctor were seen by police meeting at Lexington Avenue and 49th Street with females described as "young, wearing short dresses and bleached hair." Police followed appellant Colagrande to defendant Casella's home.

There was also extensive proof that Colagrande and certain co–defendants used lost or stolen Q cards to purchase airline tickets which were then sold by appellants at substantial discounts to customers for cash. In all, the transactions numbered in the hundreds. In addition there was proof

of several hundred communications during the period of the alleged conspiracy, either in person or by phone call, between certain defendants and co–defendants. Frequently, some appellants would refer customers to another member of the group. Often, tickets sold by certain appellants to customers had been purchased on the same stolen card used to obtain tickets sold by other appellants or defendants. Aside from the evidentiary mosaic as a whole, which provided the basis for an inference of a loose–knit scheme, the principal items of proof linking each appellant to the scheme may be summarized as follows:

*Colagrande.* There was evidence from which it could reasonably be inferred that Colagrande was one of the major actors in the group, purchasing stolen airline cards from prostitutes, using the cards to obtain tickets, selling the tickets to numerous retailers and customers, and collaborating with another possessor of stolen cards, co–defendant "Rocky" Casella, to obtain tickets with the cards and deliver them to customers. Two witnesses, Michael Sottosanti and John Ciarletta, testified to some 40 occasions when they bought airline tickets for cash from Colagrande at a 50% discount or higher, taking delivery on the street, at the theatre, or at Colagrande's house, and then delivering them to friends and relatives who had ordered them and who would pay for them in cash.

Colagrande told Sottosanti that he (Colagrande) had purchased the cards from prostitutes for $125 each. On one occasion Sottosanti saw Colagrande with a wallet filled with credit cards in other persons' names. Colagrande also stated that, in using the stolen cards to purchase tickets, he would often misspell the passengers' names to avoid being discovered. On one occasion he told Sottosanti that he could not obtain tickets at that particular time unless co–defendant Casella had a card. This was corroborated by evidence that Casella did sometimes use a lost or stolen card to buy tickets for Colagrande. There were many

phone calls over a period of six months between Colagrande and appellants Ferrara (35 calls), Margro (20 calls) and Peraino (39 calls), as well as with co–defendants Casella (76 calls) and Pedicine (38 calls). Colagrande sold tickets purchased with the same Q cards as those used to obtain tickets sold by appellant Margro and co–defendants Doctor and Pedicine. A witness named Nanoia testified that he overheard Colagrande and appellant Peraino arguing about Colagrande supplying "the goods."

*Alessi.* Three witnesses (Angelo Gamarra, Selma Elves and Harry Schwartzbach) testified to purchasing numerous airline tickets from Alessi at discounts of 40–50%. Another witness, Joe Rugus, directed several purchasers to Alessi and made deliveries of some tickets on Alessi's behalf, receiving cash which he turned over to Alessi. The tickets were purchased with Q cards that had been lost or stolen a few days previously. Delivery of one ticket to Elves was made in an automobile in exchange for $2,000 cash. Alessi once told Schwartzbach that he obtained the tickets at a discount from people who were in debt and sold their tickets to raise money. On another occasion, Alessi (through Schwartzbach) referred a purchaser (Galvez) to appellant Thomas Carcone.

Alessi also sold some tickets bought with the same stolen Q cards as those used to obtain tickets sold by appellant Jesselli. Telephone company records showed some 44 toll calls between the residences of Alessi and co–defendant Fugario between May and October, 1977. The jury might reasonably have concluded that Alessi placed his orders with Fugario, a middleman who supplied other retailers as well, and that Alessi had knowledge of at least one other retailer's activities. The Government also introduced evidence of a 1972 conviction of Alessi for conspiring to purchase airline tickets with misappropriated credit cards.

*Carcone.* One customer, Matilde Galvez, testified that she bought tickets on a number of occasions at a 60% discount from appellant Carcone, whom she knew as "Tommy." Carcone demanded payment in cash. She was referred to Carcone by Harry Schwartzbach, at the suggestion of appellant Alessi. When a customer was denied passage by an airline because his ticket was bought with a stolen card, Carcone claimed that the ticket was not illegally obtained, but paid the customer a partial refund. Schwartzbach testified that appellant Alessi instructed him to refer Galvez to Carcone, giving him Carcone's telephone number. Thus, the jury might have concluded that Carcone and Alessi were familiar with each other's activities as retailers.

*Ferrara.* Two witnesses, Milton Freedman and Enrico Marino, testified that they bought tickets on several occasions from appellant Ralph Ferrara at discounts of 40% and 15%, respectively. Ferrara sold tickets bought with the same misappropriated credit card used to obtain tickets sold by appellant Jesselli and co–defendant Koch. Police officers testified that they saw Ferrara and co–defendant Fugario together on several occasions at a luncheonette co–owned by their wives. At this restaurant, Fugario received stolen credit cards from prostitutes. Telephone company records revealed numerous calls between Ferrara and Colagrande (35 calls) and between Ferrara and Fugario (157 calls) over a six to eight–month period. The jury could have inferred from this evidence that Ferrara, through his close contacts with Colagrande and Fugario, participated in the scheme as a retailer with at least some knowledge of its general scope.

*Jesselli.* Three witnesses, Fasanella, Kucera and Lopez, testified that they purchased tickets on some 50 occasions from appellant Jacob Jesselli at discounts of 20–30%. An undercover police officer testified to making purchases of two tickets from Jesselli in a parking lot for $1100 cash which reflected a discount of 30% from the tickets' face value.

Kucera once told Jesselli that the police had told him the tickets were no good. Jesselli responded that he knew nothing about it and denied that there was anything wrong with the tickets. Jesselli sold tickets bought with the same stolen cards as those

used to obtain tickets sold by appellants Alessi, Ferrara and Martelli, as well as co-defendant Koch.

*Margro.* Testimony at trial showed that Margro sold tickets on at least one occasion to one Robert Barrow in a shopping center for cash at a 60% discount, and to an undercover police officer on a street corner for cash at a 40% discount. Barrow once accompanied Margro to Colagrande's house in an effort to purchase tickets. Another undercover purchase of tickets from Margro for cash was made on a street corner in the Bronx. When Barrow reported to Margro that some tickets had not been honored, Margro admitted that he knew the tickets were bad. Margro sold tickets which had been purchased with the same Q cards as those used to obtain tickets sold by Colagrande and co-defendant Pedicine. When Margro was confronted by police with his sale of tickets at a discount he stated that he had obtained them from a person named "Freddy" near the Whitestone Bridge or the Throgg's Neck Bridge, close to one end or the other. Telephone company records showed some 20 calls between Margro and Colagrande, whom the jury may have concluded was his supplier.

*Martelli.* Two witnesses, Sorresso and Cherem, testified that they purchased airline tickets on several occasions from Martelli for cash at a 50% discount. The tickets had been obtained by use of a credit card lost or stolen a short time earlier. Martelli admitted to an undercover agent that he used a certain airline ticket which proved to have been obtained with a stolen Q card. Martelli sold tickets which were bought with the same Q cards as those used to obtain tickets sold by appellant Jesselli.

*Peraino.* Three witnesses, Konigsberg, Ravinett and Nanoia, testified to numerous purchases of tickets for cash at discounts of 15–40% from appellant Louis Peraino, also known as Lou Perry. When an airline refused to honor a ticket sold to Konigsberg, Peraino offered reimbursement if Konigsberg could prove the loss. Peraino sold tickets purchased with the same Q card used to obtain a ticket sold by co-defendant

Pedicine. Further testimony of Nanoia, *who shared Peraino's office suite (used for theatrical casting) from 1974 to 1976*, indicated that during that period Peraino frequently received calls from people seeking to order tickets and that people often left envelopes containing cash for Peraino, in exchange for which they would pick up other envelopes. Nanoia reported overhearing an argument on one occasion between Colagrande and Peraino concerning supplying "the goods." Telephone company records also linked Peraino and Colagrande (39 calls).

## DISCUSSION

### A. *CLAIMS COMMON TO ALL APPELLANTS*

#### 1. *Single v. Multiple Conspiracies*

█ Appellants claim that the evidence at most shows a series of separate smaller conspiracies rather than the single conspiracy alleged in the indictment and that the variance caused each appellant substantial prejudice. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Berger v. United States*, 295 U.S. 78, 81–82, 55 S.Ct. 629, 630–631, 79 L.Ed. 1314 (1935). The principles governing such a claim are well settled. The Government, of course, has the burden of establishing the conspiracy alleged in the indictment. Whether it has proved the existence of this conspiracy and each appellant's membership in it or has instead proved multiple other independent conspiracies is a question of fact for a properly instructed jury, *United States v. Murray*, 618 F.2d 892, 902 (2d Cir. 1980); *United States v. McGrath*, 613 F.2d 361, 367 (2d Cir. 1979); *United States v. Taylor*, 562 F.2d 1345, 1351 (2d Cir.), *cert. denied sub nom. Salley v. United States*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Armedo–Sarmiento*, 545 F.2d 785, 789 (2d Cir. 1976), *cert. denied*, 430 U.S. 917, 97 S.Ct. 1330, 51 L.Ed.2d 595 (1977).

█ There is no claim here that the jury was not properly instructed on the subject of multiple conspiracies versus a single conspiracy. The issues therefore are

whether the evidence supports a finding that the alleged conspiracy was proved and that each appellant was a member of it and, if not, whether the variance substantially prejudiced any of the appellants. Having in mind that "the gist of the offense remains the agreement," *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964), *cert. denied sub nom. Mogavero v. United States*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), we must, in order to resolve these issues, examine the evidence to determine what kind of agreement or understanding could reasonably have been found to exist as to each appellant. This requires a review of the defendants' activities as a whole in order to determine the scope of the criminal enterprise or enterprises and whether any of them fits the pattern of the conspiracy alleged in the indictment. The next step is to review each appellant's conduct and statements to determine whether it could reasonably be inferred that he participated in the alleged enterprise with a consciousness of its general nature and extent. Assuming proof of the alleged conspiracy, it need not be shown that each appellant knew every other member or was aware of all acts committed in furtherance of it, see *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir. 1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980). It is sufficient to show that he participated in what he knew to be a collective venture meeting the allegations of the indictment. Proof of an appellant's membership depends upon the extent of his knowledge and participation, given the scale of the criminal enterprise. *Direct Sales Co. v. United States*, 319 U.S. 703, 709, 63 S.Ct. 1265, 1268, 87 L.Ed. 1674 (1943); *United States v. Paoli*, 603 F.2d 1029, 1035 (2d Cir.), *cert. denied*, 444 U.S. 926, 100 S.Ct. 264, 62 L.Ed.2d 182 (1979); *United States v. Miley*, 513 F.2d 1191, 1206–07 (2d Cir.), *cert. denied sub nom. Vavarigos v. United States*, 423 U.S. 842, 96 S.Ct. 75, 46 L.Ed.2d 62 (1975); *United States v. Borelli, supra*, 336 F.2d at 383 n.2.

█ In the present case the 17 defendants were charged with a conspiracy, extending over the 4½–year period from January 1975 to June 1979, to use stolen or lost credit cards to obtain airline tickets without authorization from the card–owners and to sell or use the tickets with knowledge that they had been so unlawfully obtained. The evidence revealed the existence of such unlawful operations by functional interlocking groups (prostitutes, middlemen, retailers and customers) who were virtually dependent on one another for overall success. Against the contention that the proof showed only a series of independent groups, each engaged in identical but separate parallel operations, there was evidence of an interrelationship and interdependency between the groups. For instance, all retailer–appellants except Jesselli, Martelli and Carcone were directly connected with middlemen Colagrande and Fugario. Each appellant, moreover, sold tickets obtained by the same Q card as that used to obtain tickets sold by at least one of his co–defendants. Jesselli and Carcone, for instance, sold tickets obtained by use of a Q card which had been used to obtain tickets for other appellants who were linked with Colagrande or Fugario. This evidence, when coupled with the nature and duration of the enterprise, which depended on a steady flow of freshly stolen or lost cards, interchange of such cards between middlemen for maximum utilization and communications between both middlemen and retailers, justifies an inference that there was one loose–knit conspiracy as alleged.

Turning to the appellants' knowledge and participation, there was sufficient direct evidence to sustain the verdicts as to Alessi, Carcone, Colagrande and Ferrara. Colagrande's statements and conduct, including his dealings with prostitutes for the purchase of stolen Q cards, his supplying tickets to several of the retailers (Ferrara, Margro, Pedicine, Peraino and probably Doctor), his many phone communications with numerous retailers, and his collaboration with Casella, who also appears to have acquired lost or stolen cards, placed Colagrande at the center of the illegal activities of many of his co–defendants and gave him more than ample reason to know the dimen-

sions of the overall conspiracy alleged in the indictment.

The record proof against Ferrara likewise supports an inference that he knowingly participated in a criminal venture of the dimensions alleged. He was seen together with Fugario, a central figure, at the very site where lost or stolen Q cards were purchased from prostitutes. Their wives were partners in the business where these purchases occurred. Fugario's purpose in buying the cards, of course, could only have been to use the cards illegally to obtain tickets. From this evidence and the very high volume of calls between Ferrara, Colagrande and Fugario, the jury was justified in finding that Ferrara knew the outlines of the illegal enterprise. The evidence against Alessi and Carcone, outlined above, justifies a similar inference as to them.

Although the evidence against the remaining four appellants (Jesselli, Margro, Martelli and Peraino) is not as conclusive on the issue of their knowledge of the dimensions of the conspiracy as that against Colagrande, Ferrara, Alessi and Carcone, we are persuaded that it was nevertheless sufficient. The evidence is clear that they participated knowingly in obtaining tickets and selling them for cash discounts to customers under circumstances making it apparent to them that the tickets had been unlawfully obtained by use of Q cards in someone else's name. Each of the four (Jesselli, Margro, Martelli and Peraino) sold tickets purchased with the same Q card as that used unlawfully to obtain tickets sold by at least one other co–defendant. Three witnesses testified to at least 50 occasions on which Jesselli supplied them with tickets in 1976 and 1977. Margro, in addition to having numerous phone calls to and from Colagrande's number, spoke with Colagrande in person, took a customer to Colagrande's home, sold unlawfully obtained tickets from 1975 to 1977 and told one customer (Barrow) that he could supply tickets when needed. Witnesses testified that Martelli sold tickets on several occasions during 1975 and 1976. Peraino and Colagrande met personally at Peraino's office, and were overheard discussing the ticket supply ("the

goods"). Telephone records show 39 calls between Colagrande's number and that of Peraino during the period of December 19, 1976, to April 21, 1977. A witness testified that Peraino received calls for tickets frequently from 1974 to 1976, and ticket sales in 1977 by Peraino were also demonstrated.

From all of these circumstances–the high volume of sales for cash discounts of tickets which disclosed on their face that they were obtained by using Q cards in different persons' names, the communications of Margro, Ferrara and Peraino with middleman Colagrande, and the long period of time during which the sales occurred–the jury could reasonably infer that each of these retailers was aware as a matter of business reality that he was participating in an illegal operation embracing more than a few transactions. When a retailer is able to sell numerous unlawfully–obtained tickets at a cut rate over a long period of time to many customers it may be inferred as a matter of common sense that he must have appreciated that he was participating in a larger scheme. The very nature of the operation, involving use of lost or stolen cards that could be used only a short time before detection, would necessitate a larger group to supply recently stolen or lost cards and thus furnish the volume of tickets needed by the retailers to conduct their business. In order to derive the maximum amount of ill–gotten gains from each stolen card during its short life span, a larger group of retailers would be required than a single retailer–appellant and one or two others. We therefore conclude that the evidence, viewed in the context of the nature and method of the operation and the number of people and mutual dependence required for it to function continuously, was sufficient to support the jury's verdict that each of the appellants joined a single loose–knit multi–person conspiracy, making it his own.

Even if a variance existed in the proof, indicating that only smaller conspiracies had been shown, we would reverse as to an appellant only upon a showing that his substantial rights had been prejudiced. 28 U.S.C. § 2211; *Kotteakos v. United States,*

*supra*, 328 U.S. at 764–65, 66 S.Ct. at 1247–1248. No such prejudice appears here. There was no charge given pursuant to *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which allows one member of a conspiracy to be convicted for substantive offenses committed by another. No appellant points to any prejudicial testimony directed against him which was received as a co–conspirator's declaration that would otherwise constitute inadmissible hearsay, Fed.R.Evid. 801(d)(2)(E).

Nor was there a prejudicial "spillover" effect. There was ample evidence that each appellant joined others in committing the substantive violations charged against him. While a prejudicial variance may become more likely as the number of improperly joined defendants increases, compare *Berger v. United States, supra* (4 defendants), with *Kotteakos v. United States, supra*, 328 U.S. at 766, 66 S.Ct. at 1248 (32 defendants), and we have warned the Government on prior occasions against using a single conspiracy count, which it cannot prove, as the basis for a mass trial and then seeking to defend convictions on the ground that the variance was not prejudicial, *United States v. Sperling*, 506 F.2d 1323, 1340–41 (2d Cir. 1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975), see also *United States v. Miley, supra*, 513 F.2d at 1207 n.10, the number of persons tried together here (10 defendants) was sufficiently small to enable the jury to give individual consideration to each. The jury's acquittal of two co–defendants indicates that it gave "each defendant the separate and individual consideration of the evidence against him to which he was entitled," *United States v. Toliver*, 541 F.2d 958, 963 (2d Cir. 1976), in accordance with the trial judge's instructions. Lastly this was not a case in which shocking or inflammatory evidence came in against co–defendants, *cf., United States v. Bertolotti*,

529 F.2d 149 (2d Cir. 1975), but rather one in which "the crimes of the various appellants were not markedly different," *United States v. Miley, supra*, 513 F.2d at 1209. The evidence against the various defendants was largely repetitive, describing transactions in which each defendant did essentially the same thing as his co–defendants had done.

We therefore find no merit in appellants' contention that there was a prejudicial variance in the proof of a conspiracy and, absent a showing of prejudice, it is unnecessary to consider the additional question of whether, even though there was evidence of guilt of the conspiracy charged, proof of other conspiracies or criminal acts might still entitle them to a new trial. See *Berger v. United States, supra*, 295 U.S. at 83, 55 S.Ct. at 631.

## 2. *Guilty Knowledge*

■ Appellants' contention that there was insufficient evidence to establish that they knew that the tickets had been purchased with illegally obtained credit cards can be disposed of summarily. Colagrande actually purchased Q cards from prostitutes. Ferrara was seen on occasion with another purchaser (Fugario) at the site of Q card purchases. Alessi's prior conviction on a similar charge supported the inference that he knew of the source of the tickets. Each appellant, on at least one occasion and some on many occasions, sold tickets bearing markings of the type commonly made when the embossed surface of a credit card is pressed against a ticket, revealing on the ticket the name of the corporation and executive to whom the Q card belonged. Although the jury, which was properly instructed,[6] was free to accept the speculations offered by appellants' counsel to the effect that the tickets themselves had been stolen or that they had been bought for cash from airline employees, it was also

---

6. The court charged the jury:
   "[T]he 'knowingly' requirement means that the defendant must have known that the tickets were purchased or obtained on a lost, stolen or fraudulently obtained credit card although he need not know the specific details of how the tickets were actually obtained or purchased or how the card was lost, stolen or fraudulently obtained."

entitled to infer knowledge, as it did, that these tickets were purchased with stolen cards. The sheer repetition of similar secretive transactions supported an inference of familiarity with the operation. In the absence of any convincing refutation of this logic at trial, see *United States v. Frank*, 494 F.2d 145, 153 (2d Cir. 1974), the jury's verdict was sufficiently supported in this respect.

### 3. *Duplicative Counts*

■ Appellant Jesselli asserts, for the first time, a claim, applicable to all appellants, that since the Government charged participation in a single conspiracy it was error to sentence him on separate counts charging that the conspiracy violated two distinct conspiracy statutes, 15 U.S.C. § 1644(a) (Count One) and 18 U.S.C. § 371 (Count Two). No such claim was asserted in the district court by any appellant. Since the objection is one which appellants were obligated to raise before trial, see Fed.R.Crim.P. 12(b)(2), they are barred by their procedural default from raising it now, see Fed.R.Crim.P. 12(f). See *Davis v. United States*, 411 U.S. 233, 243–45, 93 S.Ct. 1577, 1583–1584, 36 L.Ed.2d 216 (1973); *United States v. Viserto*, 596 F.2d 531, 538 (2d Cir.), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); *United States v. Droms*, 566 F.2d 361, 363 (2d Cir. 1977). Moreover, since one general concurrent sentence was imposed on each appellant with respect to all counts in the present case, which was within the maximum permitted under the general and specific conspiracy statutes charged in Counts One and Two, and the convictions on both counts instead of one would be most unlikely to have any collateral consequences for any defendant, see *United States v. Vargas*, 615 F.2d 952, 956–62 (2d Cir. 1980), no purpose would be served in reviewing the legality of the duplicative sentences. *Barnes v. United States*, 412 U.S. 837, 848, 93 S.Ct. 2357, 2364, 37 L.Ed.2d 380 (1973).

**7.** Fed.R.Evid. 404(b) provides:

"Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity

### B. *CLAIMS OF ALESSI*

■ Alessi claims that the district court improperly admitted evidence of his prior conviction on similar charges and that he was denied effective assistance of counsel.

Alessi had been convicted in 1972 of violating 18 U.S.C. § 371 by conspiring to defraud airline companies by purchasing airline tickets with unlawfully obtained credit cards. The conviction, admitted near the end of the Government's proof, was clearly relevant to the question of whether he had knowledge that the tickets sold by him in this case were purchased with stolen credit cards. It therefore was admissible under Fed.R.Evid. 404(b).[7] The court gave a proper limiting instruction, telling the jury:

"You may not consider it to prove the character of Mr. Alessi, in order to show that he acted in conformity with that. But you may consider it in determining Mr. Alessi's knowledge or intent or plan or motive."

The court offered to give a further instruction, but Alessi's counsel refused on the ground that it would do more harm than good, drawing attention to the evidence. The Government in summation argued that the prior conviction demonstrated knowledge of the use of stolen credit cards.

Alessi contends here that the prosecutor did not sufficiently advise the trial judge concerning the issue to which the evidence was directed and that the judge consequently failed to determine whether the probative value of the evidence outweighed the danger of unfair prejudice, Fed.R.Evid. 403. We disagree. A reading of the transcript persuades us that the judge understood fully the reason for which the evidence of the prior conviction was offered and that, while he did not utter the ritualistic incantation that its probative value out-

therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

weighed the danger of unfair prejudice, this was his considered holding.

■ We have instructed that normally evidence of a defendant's prior conviction introduɔ᠎d to show knowledge or intent should not be admitted until the conclusion of the *defendant's* case, since by that time the court is in a better position to determine whether knowledge or intent is truly a disputed issue and whether the probative value of the evidence outweighs the risk of unfair prejudice. *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980); *United States v. Danzey*, 594 F.2d 905, 913–14 (2d Cir.), *cert. denied sub nom. Gore v. United States*, 441 U.S. 951, 99 S.Ct. 2179, 60 L.Ed.2d 1056 (1979); *United States v. Benedetto*, 571 F.2d 1246, 1248–49 (2d Cir. 1978). In this case it was admitted near the end of the *Government's* case. However, no defendant objected to the timing of the admission. In view of the absence of any objection to timing, and the further facts that throughout the trial knowledge was the key issue with respect to Alessi as well as other appellants and that Alessi's knowledge of the use of stolen cards was not (and, short of admitting guilt, could not have been) stipulated, compare *United States v. Manafzadeh*, 592 F.2d 81 (2d Cir. 1979), we find no reversible error in the timing of the evidence.

■ Turning to Alessi's claim that he was denied effective assistance of counsel at trial, contrary to the guarantee of the Sixth Amendment, we are once again confronted with the difficulty of evaluating an ineffective assistance claim which has not been presented to a district court for development of a full factual record. See *United States v. Aulet*, 618 F.2d 182, 185–86 (2d Cir. 1980). Upon careful consideration of the record and the deficiencies alleged by Alessi on appeal, however, we find no need to remand the case for an evidentiary hearing. Whether governed by this circuit's "farce and mockery of justice" standard for evaluating ineffective assistance claims, *Indiviglio v. United States*, 612 F.2d 624, 626–27 (2d Cir. 1979), or the "reasonable competence" standard adopted by all other circuits, see *Brinkley v. Lefevre*, 621 F.2d 45, 47–48 (2d Cir. 1980) (Weinstein, J., dissenting); *Bellavia v. Fogg*, 613 F.2d 369, 375 n.1 (2d Cir. 1979) (Mansfield, J., concurring), we do not believe that Alessi was deprived of his Sixth Amendment rights.

The specific deficiencies alleged on appeal are failure to prepare properly, inept cross–examination, incompetent handling of the Government's offer of "other crimes" evidence, and failure to explore a purported double jeopardy issue growing out of Alessi's prior conviction (which occurred before the events on which the Government's case here rested). While a reading of the transcript does not reveal any modern–day Clarence Darrow at work, it discloses that counsel attempted reasonably to show that the witnesses could not reliably identify Alessi, that they lacked first–hand knowledge, or that they were attempting to get themselves out of trouble with the law by testifying against Alessi. Counsel's summation was competent, arguing that Alessi lacked knowledge that the tickets were purchased with stolen credit cards and following up on the arguments pursued on cross–examination. We are informed of no motions which counsel might have made with any substantial likelihood of success. We therefore cannot conclude that Alessi was deprived of effective assistance of counsel.

## C. *CLAIMS OF CARCONE*

The indictment named "Thomas Carcone" as a person who allegedly committed the crimes charged. The Government arrested and brought to trial appellant Gaetano Carcone, also known by the nickname "Tommy." Gaetano and Thomas are rough linguistic equivalents. However, Gaetano at the times alleged had a brother named Thomas. Appellant Carcone claims he is not the person named in the indictment and the Government brought the wrong person to trial.

■ The Government bears the burden of showing that appellant was the person named in the indictment, not his brother, since an indictment is returned against a

person, not simply a name. *United States v. Fawcett,* 115 F.2d 764, 767 (3d Cir. 1940). In the words of Judge Learned Hand:

> "The jurors do not indict the man who committed the crime, but him described in the evidence before them. They may select another and an innocent man, though the person arrested be guilty. If so, the prosecution fails on the issue of identity, which must be settled before that of guilt becomes relevant. Thus the only person who can be removed is the person whom the jurors mean to indict. Their meaning is to be ascertained, like any other, from the words they use, not from what is in their minds; but the meaning to be attributed to their words may, in case of doubt, be found by looking at the circumstances under which they are uttered. This is a universal canon. Now the only circumstances relevant to the words used are the evidence before them when they find the indictment, for it is from these alone that they get any acquaintance with the subject. They are to be understood, therefore, as indicting the persons described in the testimony, if doubt arises. Hence, if it be shown that the witnesses described the person arrested, he is the person indicted." *United States ex rel. Mouquin v. Hecht,* 22 F.2d 264, 265 (2d Cir. 1927), *cert. denied,* 276 U.S. 621, 48 S.Ct. 301, 72 L.Ed. 736 (1928).

The question before us, therefore, is whether appellant Gaetano Carcone, also known as Tommy Carcone, was the person described before the grand jury. That Gaetano Carcone may have been the man who *in fact* committed the acts alleged is of no significance. We must look to the description of the man which was put before the grand jury.

Matilde Galvez testified before the grand jury that, after receiving from Harry Schwartzbach the phone number, 728–3814, of a person named "Tommy" from whom she could buy airline tickets, she telephoned "Tommy" at that number, and arranged to buy airline tickets from him at a 60% dis-

count on a number of occasions. The tickets were personally delivered to her by "Tommy." At the later trial it was established that the telephone number 728–3814 was listed to the second floor of 3407 Broadway and Galvez identified appellant as the "Tommy" from whom she made the ticket purchases. Indeed, it was stipulated by appellant's counsel that appellant lived at 3407 Broadway. There is no suggestion, much less evidence, that appellant's brother had the telephone number called by Galvez or that he lived at the address for which it was listed.

Were the foregoing the only evidence before the grand jury, there would be no question about its intent to indict appellant. However, the witness Harry Schwartzbach identified before the grand jury a photo of appellant's brother as the man whom he knew as "Tommy" Carcone in his neighborhood and to whom he had rented automobiles on a couple of occasions. However, Schwartzbach did not testify that he had ever had any airline ticket dealings with appellant or with the person whose photo he selected from the spread. He simply acted as a conduit in passing along to Galvez the name Tommy and the phone number 728–3814 which Galvez used to communicate with appellant and arrange for the purchase of tickets. At trial Schwartzbach testified that his identification of the photo of appellant's brother was a mistake and that he meant to refer to appellant, not his brother.

From this record it is clear that the grand jury intended to indict the "Tommy" reached at telephone number 728–3814, to whom Galvez was referred by Schwartzbach and from whom she made ticket purchases, and that it charged that person, who was identified by Galvez, with unlawful sales of tickets to Galvez. There is nothing to indicate that the grand jury intended to indict appellant's brother for these transactions with Galvez or, for that matter, for participation in any other illegal transactions. If Schwartzbach had testified before the grand jury that Galvez or he had arranged for the purchase of tickets from the

person whose photo was selected by him there might then be some support for appellant's claim that the jury intended to indict that person for the unlawful activities alleged. But there was no such evidence before the grand jury. Nor does appellant dispute the extrinsic evidence offered at trial to show that the phone number 728–3814, to which Galvez was referred, was listed to appellant. See *United States ex rel. Curtis v. Warden*, 329 F.Supp. 333, 336 (E.D.N.Y. 1971).

Under these circumstances we reject appellant's argument that the grand jury indicted the wrong man. The grand jury indicted the Tommy living on the second floor of 3407 Broadway, with a phone number 728–3814. This was the appellant, not his brother. Although the grand jury's intent would have been clearer if Galvez had before the grand jury identified appellant by photograph, the evidence is nevertheless sufficient to indicate an intent to indict appellant, not his brother.

■ Carcone next claims that the district court erred in denying his motion for a new trial under Rule 33, F.R.Cr.P., based on his post–trial discovery of a letter by Schwartzbach, submitted two years before trial in connection with sentencing of appellant on a different violation, attesting to Schwartzbach's acquaintanceship for three years with a "Gaetano" Carcone, which is appellant's correct name, to whom Schwartzbach had rented automobiles. At trial Schwartzbach had testified that he did not recall any occasion when Carcone had used the name "Gaetano" in their dealings. Appellant contends that the letter would have enabled him to impeach Schwartzbach's credibility as a Government witness against him.

In our view the trial judge's ruling was correct and in accordance with our repeated instructions that such a motion "should be granted only with great caution" and only upon a showing that the evidence could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal. *United States v. Stofsky*, 537 F.2d 237, 243 (2d Cir. 1975), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976); *United States v. Slutsky*, 514 F.2d 1222, 1225 (2d Cir. 1975); *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.), *cert. denied*, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958).

Here there was no showing that the new evidence could not have been uncovered earlier through exercise of due diligence. At trial appellant offered evidence of parking tickets and accident claims issued in the name of "Gaetano" Carcone for violations with respect to autos rented by appellant from Schwartzbach. Other evidence introduced at trial indicated Schwartzbach was aware that appellant was sometimes referred to as "Gaetano." Since appellant was apparently aware of the letter during trial he could just as easily have obtained it then as after his conviction.

Regardless of appellant's lack of due diligence the letter was at most cumulative and not exculpatory. Although it could have been used to impeach Schwartzbach on a collateral issue, his knowledge that appellant sometimes used the name "Gaetano" (which was argued by appellant's counsel to the jury), it would not have affected his testimony, corroborated by Galvez, that he had referred her to the telephone number of appellant who admittedly used the name "Tommy". Thus the evidence would not have led to an acquittal.

Appellant Carcone's other claims are equally meritless. The prosecutor's reference in rebuttal summation to Carcone's previous arrest record, which showed that he used the name "Tommy," was permissible. Carcone had introduced the evidence by calling Detective Miceli as a defense witness in an effort to show that police records referred to appellant as "Gaetano," only to be met with testimony that he had used the nickname "Tommy." Nor did the trial judge commit reversible error in refusing to give Carcone's request for an instruction that accomplice testimony "should be examined with great caution." Judge Nickerson's instruction to the jury that it

"should carefully scrutinize all of the testimony given" and consider with "caution" and "great care" the testimony of witnesses who had been promised immunity by the Government (which includes the witnesses Galvez and Schwartzbach, who testified against Carcone) was adequate under the circumstances, in view of the objection by Peraino to Carcone's requested instruction.

## D. *CLAIM OF FERRARA*

■ Ferrara claims that the court erred in admitting against him the testimony of Milton Freedman regarding telephone conversations with a person named "Corky" in which Freedman arranged cash purchases of airline tickets at a discount. He argues that the conversations were not authenticated as prescribed by Rule 901, Fed.R. Evid.[8] The claim is meritless.

The phone number called by Freedman was listed in the name of Ferrara's wife at their residence. At trial Freedman identified Ferrara as "Corky" and further testified to meeting Ferrara, known as "Corky," at Kennedy Airport where Freedman paid him for the tickets. Thereafter he arranged further purchases of tickets by telephone with Ferrara in the same manner, mailing money to Ferrara and receiving airline tickets in return.

This authentication of Ferrara's voice was adequate. The illustrations in Rule 901(b)(6) are just that, illustrations, and not limitations on methods of identification that may be used.

## E. *CLAIMS OF MARTELLI*

■ Martelli raises two additional claims on appeal relating to remarks in the prosecutor's summation which he claims were improper and mandate reversal of his

conviction. The first comment by the prosecutor was:

"You will also recall that Anthony Martelli made a statement to one of the detectives after being advised of his rights. He admitted that he flew on that particular flight. He was shown the ticket and admitted flying in January of 1976 with several of his friends but stated he could not remember their names."

The portion relating to Martelli's recollection of his companions, while true, was not in evidence. When Martelli's counsel raised this objection, the judge responded correctly that the jury's recollection controlled.

While it was improper to include facts not in evidence in the summation, the error here was harmless. Whether or not Martelli could name the individuals who accompanied him on the flight was of virtually no significance to the matters in dispute, which were whether Martelli used an illegally obtained ticket and knew how it was obtained. There was substantial evidence of other similar transactions in which he had engaged. This apparently inadvertent reference to a fact of little significance not in evidence did not deprive him of a fair trial. See *United States v. Suarez*, 588 F.2d 352, 355 (2d Cir. 1978); *United States v. Tortora*, 464 F.2d 1202, 1207 (2d Cir.), *cert. denied sub nom. Santoro v. United States*, 409 U.S. 1063, 93 S.Ct. 554, 34 L.Ed.2d 516 (1972).

Martelli's second claim arises from the prosecutor's statement in summation:

"Also, this was a cash business and the business involved the selling of these airline tickets at substantial discounts. There were no restrictions on these tickets. The people who ordered these tickets could get first–class or regular tick-

8. Fed.R.Evid. 901 provides in pertinent part:
   "(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.
   "(b) Illustrations. By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:
   ... (6) Telephone conversations. Telephone conversations, by evidence that a call was made to the number assigned at the time by the telephone company to a particular person or business, if (A) in the case of a person, circumstances, including self–identification, show the person answering to be the one called...."

ets. They could order the tickets for any destination anytime. It didn't matter whether the tickets were for night travel or day travel, weekend travel, weekday travel. I think all of your common knowledge from advertised airline rates indicates that any kind of reduced or discounted airline fares depends on some kind of special restriction from the airline, none of which was found in any of these cases."

The prosecutor's purpose was to show that the defendants must have known there was something wrong with the tickets. Martelli objects that it referred to matter not in the record. While the extent of the jurors' "common knowledge" in this respect is dubious, there had been considerable testimony from witnesses, including an official of a major airline, as to the circumstances and conditions under which tickets could be purchased at a discount. We do not believe that this comment was sufficiently objectionable to warrant reversal.

## F. CLAIMS OF PERAINO

Peraino argues that reversal of his conviction is required because (1) the Government unfairly presented a surprise witness against him at trial, and (2) the prosecutor improperly called attention in summation to the fact that Peraino had not testified on his own behalf. We find no merit in either claim.

■ The witness was Frank Nanoia, who shared offices with Peraino. Nanoia gave damaging testimony, linking Peraino with Colagrande and testifying to the frequency with which Peraino received orders for airline tickets. The prosecution had indicated that it expected to call only two witnesses against Peraino: Konigsberg and Ravinett. It was not until the night before Nanoia testified that the Government reached an immunity agreement with him; there is no indication that this was timed to disadvantage Peraino or that the Government intentionally misled him. Under these circumstances the Government was unable to give earlier notice and should not have been precluded from introducing Peraino's testimony.

In any event, the prosecution was under no obligation to give Peraino advance warning of the witnesses who would testify against him. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). Moreover, the Government furnished to Peraino all impeachment–related material concerning Nanoia after its direct examination, see 18 U.S.C. § 3500(a). Defense counsel was granted a continuance to read the material and prepare for cross–examination of the witness. See *United States v. Cowles*, 503 F.2d 67, 68 (2d Cir. 1974), *cert. denied*, 419 U.S. 1113, 95 S.Ct. 790, 42 L.Ed.2d 811 (1975). No prejudice has been demonstrated.

■ Peraino's other claim is that the prosecutor improperly called attention to his failure to testify on his own behalf at trial by saying in summation:

"If Perry [a/k/a Peraino] admits getting airline tickets and selling them and only claims a lack of knowledge that the tickets were purchased with stolen credit cards, who is he getting these tickets from if not John Colagrande?"

It is, of course, improper for the prosecution to comment on the silence of a defendant in a criminal trial. *Jenkins v. Anderson*, 447 U.S. 231, 232, 100 S.Ct. 2124, 2126, 65 L.Ed.2d 86 (1980); *Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 1232, 14 L.Ed.2d 106 (1965). However, we do not agree that the prosecutor's statement amounted to such a comment. Evidence of the source of Peraino's tickets need not have come from the mouth of Peraino, see *United States v. Barnes*, 604 F.2d 121, 148 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980), nor would the jury naturally construe the prosecutor's remarks to be directed to the failure of the defendant to testify. *United States v. Armedo–Sarmiento, supra*, 545 F.2d at 793. The comment was a simple rhetorical question calling attention to an inference which could fairly be drawn from the evidence before the jury. *United States v. Parness*, 503 F.2d 430, 437 n.10 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d

801 (1975); *United States v. Dioguardi*, 492 F.2d 70, 82 (2d Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 112 (1974); *United States ex rel. Leak v. Follette*, 418 F.2d 1266, 1268–69 (2d Cir. 1969), *cert. denied*, 397 U.S. 1050, 90 S.Ct. 1388, 25 L.Ed.2d 665 (1970). We therefore reject Peraino's claim.

We find no merit in any of the other arguments raised on appeal, and accordingly affirm the convictions of all appellants.

FRIENDLY, Circuit Judge, concurring:

I join in all of Judge Mansfield's thorough opinion, with a single exception. I would not wish to be understood as agreeing with what I understand to be the suggestion that even though the proof demonstrates the single conspiracy charged, under *Berger v. United States*, 295 U.S. 78, 82–83, 55 S.Ct. 629, 630–631, 79 L.Ed. 1314 (1935), a particular conspirator might nevertheless be entitled to a reversal if the evidence also showed the existence of one or more other related conspiracies. Since that issue is not before us, we can properly leave it for another day.