UNITED STATES of America

v.

Stephen R. BUZZI, Defendant.

82 Cr. 55(MP).

United States District Court,
S.D. New York.

Aug. 8, 1984.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by K. Chris Todd, Asst. U.S. Atty., New York City, for U.S.

Caesar D. Cirigliano, The Legal Aid Society, Federal Defender Services Unit by Leonard F. Joy, New York City, for defendant.

## MEMORANDUM

MILTON POLLACK, Senior District Judge.

Defendant was convicted of seven counts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. He now moves for a new trial, pursuant to Fed.R. Crim.P. 33, on the ground that the government withheld from him exculpatory evidence in its possession, or, in the alternative, that the undisclosed matter is newly-discovered evidence. For the reasons to be set forth below, defendant's motion will be denied in all respects.

Defendant, in May and June of 1979, was a salesman for International Metals Exchange, Ltd. (IME), a commodities "boiler room." As an IME salesman, defendant placed telephone calls to people throughout the United States, inducing them to purchase "deferred delivery contracts" for gold and silver. Actually, what he was selling was no more than an option to buy gold and silver. The defendant employed high pressure sales techniques and patent misrepresentations, in order to induce unsophisticated investors to purchase these options. Virtually all the investors lost all the money which they invested in these options.

Government witnesses testified at defendant's trial that defendant made bold and brazen misrepresentations of fact to make the sales to the unsophisticated and gullible purchasers on a wide variety of subjects. The customers induced to buy these contracts were crassly characterized by the personnel in the boiler room as "jerks," "suckers," or "peasants." According to the testimony, defendant misrepresented the age and reputation of IME, the nature of IME's business, the extent of IME's links with organized commodities exchanges and the character of IME's usual clients to potential investors. Defendant also misrepresented to potential purchasers the nature of their investment, the refundability of funds paid to IME to purchase the paper and the riskiness and likely profitability of this sort of investment.

At trial, defendant offered testimony tending to show that IME purchased gold and silver futures or options from commodity wholesalers whenever IME sold a precious metal option to an individual investor. Defendant argued at trial that this testimony established that IME was a bona fide commodity options dealer, in that IME was prepared to "cover" any delivery obligation that might arise upon exercise of a commodity option by an individual investor. However, the issue was not whether the so-called "deferred delivery contract" was covered by a metals contract or commitment, but was the nature of the instrument being sold and the identity of IME, its usual clients, and actual business.

The evidence forming the basis of this application for a new trial does not relate to the fraudulent statements of Buzzi to his purchasers, but consists of a batch of papers indicating IME's attempts to purchase commodity option contracts from precious metal wholesalers. Moreover, the documents relate to periods prior to the time defendant was employed by IME and do not mention Buzzi. The Government contends that some of these documents were not in the possession of the Government at the time of the defendant's trial, and that the Assistant United States Attorney who prosecuted the defendant, Jeffrey Livingston, never saw the documents in question. The defendant, on the other

hand, contends that his trial counsel had requested production of such documents, and that Mr. Livingston informed trial counsel that those documents had been inadvertently destroyed by one Shoher, who had purchased IME in 1979 and who was both cooperating with the Government, and at the same time being investigated by the Government for other crimes than here involved.

The application before the Court presents a designed confusion to mask the immateriality and irrelevancy of the batch of papers relied on to the instant prosecution of Stephen Buzzi and the basis of his conviction. The papers turned up in another case following a grand jury subpoena and other efforts of the prosecutor in that case which was tried subsequent to Buzzi's case.

 A defendant seeking a new trial either on the ground that the prosecution failed to produce exculpatory material,[1] or on the basis of newly discovered evidence, must demonstrate that the documents not supplied to the defendant on trial were material to and might have affected the outcome of the trial. The materiality standard, of course, is lower when the basis of the new trial motion is failure to disclose specifically requested exculpatory material than it is when a new trial is sought on new evidence grounds. When a defendant makes a specific request for production of information in the government's possession which is not disclosed to the defendant, he is entitled to a new trial if there is any reasonable likelihood that the evidence could have affected the outcome of the trial. *United States v. Agurs*, 427 U.S. 97, 103–04, 96 S.Ct. 2392, 2397–98, 49 L.Ed.2d 342 (1976); *Ostrer v. United States*, 577 F.2d 782, 786 (2d Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979). In contrast, a new trial may be granted on the basis of newly discovered evidence only if that evidence is material, is

not cumulative, and would probably have led to an acquittal had it been admitted at trial. *United States v. Alessi*, 638 F.2d 466 (2d Cir.1980). Specifically requested exculpatory data insufficiently "material" to serve as a basis for a new trial under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), therefore, cannot warrant a new trial as "newly discovered evidence."

 The data which defendant claims the Government failed to produce despite his counsel's specific request for its production is insufficiently "material" to serve as a basis for a new trial under *Brady v. Maryland* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), let alone as "newly discovered evidence." That data tends to demonstrate that IME did not sell "naked" options (options which could not be exercised by purchasers due to the seller's lack of ownership of the underlying commodity) to its investors. The defendant, however, was never charged with selling "naked" options; the indictment merely charged him (and his co-defendant) with falsely representing to potential investors that IME was in actual possession of the gold and silver backing the "deferred delivery contracts" offered for sale. The data in question thus serves only to demonstrate the falsity of this representation.

Far from leaving the jury with any claim or impression that the defendant sold "naked" options to IME investors, the prosecutor acknowledged in his closing argument that IME had placed "covering" orders with commodity wholesalers whenever "deferred delivery contracts" were purchased. (Transcript, 1156). Elsewhere in that summation the prosecutor stated that the placement of such "covering orders" provided no basis for defendant's representation to make the sales of the paper that IME bought gold at a discount (Transcript, p. 1153) and merely noted that a government witness testified to a co-defendant's

---

1. While it appears unnecessary to reach the question whether the Government had in its possession at the time and failed to furnish *Brady* material, the allegedly requested material would not have been "material" had it been in the prosecutor's possession or known to him, and had he failed to furnish it.

statement that the commodity wholesalers with whom IME placed covering orders were "part of the same paper operation" as IME. (Transcript, p. 1150).

The Government's theory of this case never was that the defendant sold "naked" options to unsuspecting investors, but that the defendant employed misrepresentations in inducing the purchase of commodity options. The indictment stated that among the false and misleading representations, pretenses and promises were the following:

 a. Statements and pretenses that IME was controlled by the federal government;

 b. Statements and pretenses that the contracts sold by IME were traded on and purchased through the New York Stock Exchange;

 c. Statements and pretenses that IME had been in business since before 1929 or that it had been in business for many years.

 d. Statements and pretenses that the non-refundable fee was wholly or partially refundable or that it represented a down payment by the customer on the purchase of gold or silver;

 e. Statements and pretenses that most of IME's customers were banks and big firms;

 f. Statements and pretenses that the contracts sold by IME conferred upon the investor title in actual gold or silver.

 g. Statements and pretenses that the gold or silver backing the contracts was stored for IME in a bank or in IME's vaults; and

 h. Promises that gold or silver would be set aside at IME's bank or in IME's vaults in the name of the customer.

At closing, the Government argued that the defendant's fraud lay principally in leading investors to believe that they were purchasing gold and silver, rather than gold and silver options. Investors were thus unaware that the fee paid IME was an option price and, therefore, that the profitability of their investments depended upon appreciation in the price of gold *above* that amount of appreciation which would enable

them to recoup the option fee. (Transcript, p. 1157, 1167–70).

The non-exculpatory character of the documents on which this motion is based is demonstrated, moreover, by this Court's instruction to defendant's trial jury that any good faith belief held by the defendant in the ultimate profitability of a "deferred delivery contract" purchase would not excuse the deliberate use of misrepresentations to induce purchases of those contracts. (Transcript p. 1271). Defendant's trial jury was thus effectively instructed that the validity and ultimate profitability of the options sold by the defendant were irrelevant to the jury's determination; the jury was instructed to find the defendant guilty if they found that he had deliberately employed misrepresentations in selling "deferred delivery contracts."

The documents upon which the defendant predicates his motion for a new trial not only fail to tend to exculpate him, they merely cumulate evidence introduced at trial. Testimony elicited by defendant from several witnesses tended to demonstrate that IME "covered" the "deferred delivery contracts" it sold to investors. (Transcript, p. 552, 879, 887). The documents on which this motion is based do no more. While the cumulativeness of this alone would not suffice to demonstrate its immateriality under *Agurs*, its cumulativeness makes it unlikely that its introduction could have affected the outcome of the trial. The cumulativeness of this material, moreover, precludes any possibility that the material warrants a new trial as "newly discovered evidence." *United States v. Alessi, supra* at 479.

Finally, even if the defendant had been accused of knowingly selling "naked options," the documents upon which he bases this motion would not tend to exculpate him of that accusation. Those documents tend only to demonstrate that IME had agreements with various commodity brokers which enabled IME to cover the "deferred commodity contracts" it sold. They do not tend to demonstrate that the contracts sold by the defendant were so cover-

ed; there is nothing in those documents showing any purchase by IME of a gold or silver option during the period the defendant was employed at IME. While this weakness in the material alone might not suffice to render it immaterial under *Agurs,* such a weakness makes it less likely that its introduction could have affected the outcome of the trial.

The material upon which the defendant predicates this motion is cumulative evidence not appreciably tending to exculpate him of acts of which he was never accused. It carried no possibility that it might create a reasonable doubt in Buzzi's favor and could not have affected the outcome of his trial, and thus cannot serve as a basis for an order for a new trial, as either specifically requested exculpatory material which the Government failed to produce or as newly discovered evidence aside from the fact that the material was *not* specifically requested and that it does not relate to any transaction sold by Buzzi.

Accordingly, defendant's motion is denied.

SO ORDERED.