UNITED STATES of America, Appellee,

v.

Peter ROSA, also known as Pete Rosa, Howard Lipson, also known as Howie Lipson, Thomas Czys, also known as Tommy Czys, and Nisim Shmariahu, also known as Nino Shmariahu, Defendants-Appellants.

Nos. 430-433, Dockets 93-1120, 93-1121, 93-1160 and 93-1219.

United States Court of Appeals, Second Circuit.

Argued Nov. 3, 1993.

Decided Feb. 23, 1994.

Daniel A. Nardello, Assistant United States Attorney, New York, New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Brooklyn, New York, Maria L. Zanfini, Nelson W. Cunningham, Assistant United States Attorneys, New York, New York, on the brief), for Appellee.

Ruth M. Liebesman, New York, New York, for Defendant–Appellant Peter Rosa.

Robert A. Ugelow, Brooklyn, New York, for Defendant–Appellant Howard Lipson.

Joseph W. Ryan, Jr., Uniondale, New York, for Defendant–Appellant Thomas Czys.

Michael F. Bachner, New York, New York, for Defendant–Appellant Nisim Shmariahu.

Before OAKES, KEARSE, and ALTIMARI, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Peter Rosa, Howard Lipson, Thomas Czys, and Nisim Shmariahu appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before John S. Martin, Jr., *Judge,* sitting by designation, convicting them of conspiring, in violation of 18 U.S.C. § 371 (1988), to receive stolen goods in violation of 18 U.S.C. § 2315 (1988). The defendants were sentenced principally to serve the following terms of imprisonment, each to be followed by three years' supervised release: Rosa 49 months, Lipson 24 months, Czys 21 months, and Shmariahu 27 months. On appeal, defendants principally raise issues of venue with respect to an earlier trial in another district, double jeopardy, and insufficiency of the evidence. They also challenge their sentences. For the reasons below, we reject their contentions and affirm the judgments.

## I. BACKGROUND

The present appeals arise out of the prosecution and two trials of appellants, along with one Joseph Fratta, who was acquitted, for conspiracy to receive and resell stolen goods, primarily silver and jewelry. The evidence presented at both trials included the testimony of special agent David Maniquis of the Federal Bureau of Investigation ("FBI"), who had an undercover role in the investigation; the testimony of confidential informant Aaron Rosen; some two dozen tape recordings of conversations between those witnesses and the defendants other than Shmariahu; and evidence of telephone calls between the residences of Rosa and Shmariahu. Taken in the light most favorable to the government, the evidence revealed the following.

### A. *The Events*

In July 1991, Rosen, who had been arrested and had entered into a cooperation agreement with the government, met with Rosa at a restaurant in Brooklyn. Acting on instructions from the FBI, Rosen told Rosa he had been arrested for selling counterfeit perfume. Rosa responded that Rosen should not do stupid things and that the next time he should consult Rosa before doing anything.

On August 7, 1991, Rosen met Rosa and Joseph "Joey" Fratta at a cafe in Manhattan. Rosa told Rosen to bring Rosa "[a]ny kind of cologne, any that kind of stuff, that's that's [sic] not good.... Bring it to Joey, we'll take all you got." Rosa also told Rosen, "[a]nything you got take it to him first"; "[n]o matter what it is give it to him. Bring it to Joe." Fratta said, "just bring it to me and I gonna be responsible."

On August 16, Rosen met Fratta at a social club in Manhattan. During this meeting, Rosen told Fratta that he knew "a Russian guy" who could get "gold and diamonds." Fratta responded, "[i]t's swag, it's hot, swag gold. It's gotta be. I don't know anybody off the top of my head. Pete, Pete [Rosa] may have somebody." Fratta then questioned Rosen about his source for the "hot" merchandise and said he would talk to Rosa about it. A few days later Rosen received a call from Rosa instructing him to take his source "to Joey" and to call Rosa when the source was available for business.

On August 27, Rosen met Rosa at the Brooklyn restaurant where the July meeting had occurred (the "Brooklyn restaurant") and proffered a bar of silver as a sample for a larger transaction, along with a price list of other goods his source had for sale. Rosa agreed to meet with Rosen's source. On August 28, Rosen introduced undercover FBI agent Maniquis as the source of the supposedly stolen silver. (In fact, the silver and all of the supposedly stolen items brought to New York came from a government warehouse in Washington, D.C.) Repeatedly cross-examining Maniquis as to whether he was a police officer and threatening him with retribution if he were, Rosa agreed to buy silver from him at approximately ⅔ of the market rate for that commodity. Maniquis showed Rosa a sample 100-ounce bar and pointed out the bar's engraved serial numbers, stating that the silver would have to be sold outside of New York; Rosa agreed. The two then discussed possible future silver deals, including one for 900 pounds during the second week of September

and one for 2,000 pounds sometime in October. Maniquis told Rosa that the original source of the silver was a man who was about to retire from his job with a silver company. Despite expressing concern that the source, if caught, would betray them to the authorities, Rosa agreed to buy 25 100–ounce bars on August 30. Rosa took the sample 100–ounce bar with him when he left the meeting; a surveillance agent followed him to the building in which Lipson lived.

On August 30, Rosen and Maniquis met Rosa at another location in Brooklyn to transfer the remaining 24 100–ounce silver bars that Rosa had agreed to purchase. Rosa was accompanied by Czys, who Rosa said was to assist in the transaction. During this meeting, Rosa indicated that he did not have sufficient funds with him, and the group agreed to meet later in the day at the Brooklyn restaurant to complete the transaction. When they reconvened, Rosa told Maniquis to give his truck keys to Czys, who would transfer the silver to the buyer's car in the parking lot. Rosen saw Shmariahu get out of his car to help Czys when it became apparent that the silver was too heavy for one person to move. Czys and Shmariahu transferred the silver to the trunk of Shmariahu's car, while Rosa paid Maniquis $6,400 in cash.

Rosa said he was also interested in purchasing stolen watches and jewelry and could fence various forms of electronic equipment. Maniquis and Rosa concluded their meeting with a discussion of the possible sale of "warm" watches. Maniquis warned that the serial numbers would have to be removed, and Rosa said that they would be because, "I deal only with professionals." Rosa also promised that the watches would be sold outside of New York.

On September 10, Rosa, Maniquis, and Rosen met again at the Brooklyn restaurant; Lipson also was present. As previously requested by Rosa, Maniquis proffered a list of "stolen" watches he had for sale; the list itemized each of the 17 watches' estimated actual value and Maniquis's asking price, which in each case was approximately 20% of the estimated actual value. Maniquis also gave Rosa a gold Omega watch as a sample.

Rosa agreed in principle to the transaction, indicated that the actual transfer would take place in Lipson's mother's apartment, and stated that the watches would be sold outside of New York. The meeting concluded with a discussion of a possible future deal for 5,600 pounds of silver, and the confirmation of their agreement for a sale on September 19 of 1,000 pounds of silver. For that delivery, Lipson volunteered to provide a van.

On September 12, Maniquis met Rosa and Rosen at the Brooklyn restaurant and gave Rosa a bag with the supposedly stolen watches, after which Rosa and Rosen went to Rosa's Brooklyn home and there met Shmariahu. After Shmariahu performed an acid test on the watches to verify their gold content, discarding one that he said was not gold, he asked Rosa whether Rosen could be trusted. When Rosa vouched for him, Shmariahu gave Rosa cash for the watches; Rosa in turn gave Rosen $7,000 to give to Maniquis, plus $700 to keep as a commission.

On September 23, Rosa and Rosen met at the Brooklyn restaurant to arrange a sale of jewelry that Rosen said Maniquis had received from a cousin in Florida, who had acquired it under circumstances that Rosen said were "not our business." Once again the list of available items showed estimated actual values and asking prices; this time the asking prices were generally 10–20% of the values listed. Rosa agreed to meet Maniquis on September 26 to buy the jewelry. He said, "[T]hey're not gonna put us in jail unless [Maniquis] is wired."

On the afternoon of September 26, when Maniquis went to the agreed meeting place to transfer the jewelry, only Rosen was there, saying that Rosa had had an emergency and could not meet then. Later that day, Rosa telephoned Maniquis at a number in New Jersey and said he could meet Maniquis at 9 p.m. Maniquis said he would bring the jewelry back to Brooklyn at that time. The two, with Rosen, met at 9 p.m., and Maniquis delivered the jewelry to Rosa, agreeing that Rosa could pay Rosen later. Later that evening, Rosa paid Rosen $8,500 for the jewelry. At Rosa's request, Rosen returned $100 of this to be paid to Lipson.

In the 9 p.m. meeting, Maniquis said he would soon have available the 5,600 pounds of silver discussed on September 10. Rosa said his buyer would prefer to take the silver in installments. He said the buyer could handle any quantity of stolen jewelry, gold, or silver bars, and could provide $700,000 on a day's notice, but did not want to take possession of such a large quantity of silver at one time: "Cause you know what he said, he says, 'Pete, if they come with three, four thousand pounds, what happens, God forbid, my place gets raided, and I don't get a chance to melt it down fast enough.'" On September 29, Maniquis reported to Rosa by telephone that he had spoken to the source about the way Rosa wanted the deal structured and that the source had been pleased with the proposed arrangement. Maniquis said he had to go to New Jersey to see the source the next day in order to work out the details of amounts and timing of deliveries.

On October 7, Maniquis, Rosa, and Rosen met at the Brooklyn restaurant, and Rosa agreed to buy 10 68–pound bars of silver two days later. They agreed that Czys would drive Maniquis's truck containing the silver to Shmariahu's Long Island home. Maniquis asked whether Rosa would have Czys pick up the silver from the source in New Jersey. Rosa declined, saying it would be safer if Maniquis picked it up. They then discussed the logistics of the sale of the additional 5,600 pounds of silver, and confirmed their decision to have delivery made piecemeal. When Czys arrived at this meeting, Rosa told him to meet Maniquis at 1 p.m. on October 9 in the restaurant's parking lot and that Rosa would explain the plan to Czys later.

On October 9, Czys met Maniquis as planned to get the truck containing the 680 pounds of silver bars. As Czys was opening the door to the truck, however, he was arrested by FBI agents. Czys immediately said to the arresting agent, "That stuff doesn't belong to me. I'm only doing somebody a favor." After being informed of his *Miranda* rights, Czys said he did not know Maniquis. Czys also asked whether a deal could be worked out in light of the fact that his grandfather had been a detective. Rosa and Lipson were arrested later that day, and

Shmariahu was arrested the next day. Shmariahu, after being informed of his *Miranda* rights and of the charge, denied that he had ever dealt in stolen goods. Further informed that those with whom he was accused of conspiring were Rosen, Rosa, and two others named "Tom" and "Howard," Shmariahu stated that he had never done business with Rosa, did not know an Aaron Rosen, and did not know anyone named "Tom" or "Howard."

### B. *The First and Second Trials*

In October 1991, defendants were indicted by a grand jury in the Southern District of New York on the charge of conspiring, in violation of 18 U.S.C. § 371, to receive, possess, conceal, store, sell, and dispose of stolen goods in violation of 18 U.S.C. § 2315. Trial under this indictment began in February 1992 before Judge Martin of the Southern District. Toward the end of the government's case, which was largely as set forth above, Judge Martin *sua sponte* asked the government to brief the sufficiency of its evidence as to venue in the Southern District. The only acts ascribed to defendants in the Southern District were the August 7 and 16 meetings in Manhattan; the other allegedly conspiratorial conduct had occurred in Brooklyn or Long Island, which are in the Eastern District. The government argued that the August 7 and 16 meetings sufficed to establish venue in the Southern District; defendants moved under Fed.R.Crim.P. 29 for judgments of acquittal for lack of proof of venue. The district court, though deeming it an exceptionally close case, agreed with the government and denied the motions for acquittal.

During four days of deliberations, the jury sent the court a series of notes posing questions that revealed the jury's concern as to the connection of the alleged conspiracy to the Southern District. The jury repeatedly asked for replaying or transcripts of the tapes of the August 7 and 16 meetings. On the second day of deliberations, it sent a note stating:

> After 6 hours of deliberation, we seem to be going nowhere. Because of the bad quality of the tapes of the August 7th and

August 16th meetings, some jurors can't find any evidence to conclude there was a conspiracy. Other jurors believe that even though those tapes don't show much evidence they are able to conclude a conspiracy existed based on the overall evidence.

Could you please instruct us further on the law as it applies here.

(Court Exhibit 11.) A few hours later, the jury sent a note asking for clarification of the instructions that

"[i]n order to convict any.... conspiracy began.... with Rosa and/or.... Fratta in Manhattan....["]

What does it mean to begin (began)? in Manhattan.

Do we need both Rosa *and* Fratta in agreement?

Or do we need just one Rosa *or* Fratta in agreement? with someone else.

(Court Exhibit 15 (brackets added; emphases, punctuation, and ellipses in original).) The jury sent another note, apparently at the same time, asking:

If we cannot get unanimous agreement that there was a conspiracy formed in Manhattan between Rosa and Fratta, then does it necessarily follow that we would have to acquit all the defendants?

(Court Exhibit 15 [*sic*].)

On the morning of the third day of deliberations, the jury sent a note stating, "We cannot reach a unanimous verdict." The court responded by giving an *Allen* charge (*Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). In the afternoon, the jury sent a note stating:

We cannot reach[ ] a verdict as to whether there was a conspiracy in New York, we are further apart at this hour.

Can we return a verdict of not guilty of any individual defendant in spite of the above.

(Court Exhibit 20.) After a weekend break and several more hours of deliberation, the jury sent its final note: "After many hours of deliberating, we are unable to reach an unanimous decision as to any defendants. We are hopelessly divided." (Court Exhibit 24.)

Defendants urged the court to give the jury a second *Allen* charge. The court declined, noting that it was

the third time the jury has told me that they could not reach a unanimous agreement. They have deliberated now for over three days. I think, in light of that, to give them an *Allen* charge again, when I think the evidence is very clear that they have very carefully weighed the evidence, ... would indeed be coercive, and so I am not prepared to do that.

Over defendants' objections, the court declared a mistrial. Thereafter, defendants again moved pursuant to Rule 29 for judgments of acquittal based on lack of evidence to support venue in the Southern District. The court again denied their motions.

After declaring the mistrial, Judge Martin asked the Assistant United States Attorney ("AUSA") to inform him promptly "whether or not the government intends to do the smart thing here and bring this case where it belongs." At the next conference with the court, the government reported its decision to follow the court's advice, and it promptly brought the case to a grand jury in the Eastern District. In April 1992, the new grand jury indicted Rosa, Lipson, Shmariahu, Czys, and Fratta on the same conspiracy charge. The Southern District indictment was subsequently dismissed without prejudice.

Thereafter, with Judge Martin sitting in the Eastern District by designation, defendants were retried before him in that district. The evidence was as described above, and the jury returned verdicts of guilty against Rosa, Lipson, Shmariahu, and Czys. Those four were eventually sentenced as indicated above. As to Fratta, the jury returned a verdict of not guilty.

The convicted defendants have appealed, contending principally (1) that, because of lack of proof of conspiratorial conduct in the Southern District of New York and the jury's deadlock on that question, the retrial in the Eastern District violated their rights to be free of double jeopardy, and (2) that they could not be convicted of conspiring to violate § 2315 because (a) the goods they purchased were not in fact stolen, and (b) there was

insufficient evidence to support an inference that they believed the goods had traveled interstate, as required for a violation of that section. Individual defendants also raise other challenges to their convictions and to their sentences. For the reasons below, we find their contentions to be without merit.

## II. CHALLENGES TO THE PROSECUTION

Defendants make a number of arguments that have their provenance in the original prosecution in the Southern District. These include the contentions that there was insufficient evidence of venue in the Southern District, and that therefore (1) the declaration of a mistrial was error, and the court should instead have granted judgments of acquittal, and (2) the present action in the Eastern District violated defendants' rights to be free from double jeopardy. Even if the doctrinal premises had validity, all of these contentions depend on the proposition that the evidence of venue in the Southern District was insufficient, and we conclude that defendants have failed to meet their heavy burden of showing such insufficiency.

### A. The Doctrinal Problems

■ In general, the Double Jeopardy Clause does not preclude a second trial if the district court's decision to declare a mistrial was made because of a "manifest necessity." *Wade v. Hunter*, 336 U.S. 684, 690, 69 S.Ct. 834, 837–38, 93 L.Ed. 974 (1949); *United States v. Huang*, 960 F.2d 1128, 1134 (2d Cir.1992); *United States v. Ustica*, 847 F.2d 42, 48 (2d Cir.1988). A deadlocked jury is the paradigmatic example of such necessity. *See, e.g., Richardson v. United States*, 468 U.S. 317, 323–24, 104 S.Ct. 3081, 3085–86, 82 L.Ed.2d 242 (1984); *United States v. Rivera*, 802 F.2d 593, 597 (2d Cir.1986).

Defendants contend that despite the hung jury, the court should not have declared a mistrial but should instead have granted their motions for judgments of acquittal because the evidence in the first trial was insufficient to support a finding of venue in the Southern District. This proposition seems to be foreclosed by the decision in *Richardson v. United States*. In that case, the Supreme Court ruled that the Double Jeopardy Clause does not bar retrial of a defendant where the jury was unable to reach a verdict, even if at the first trial the government failed to introduce proof that was legally sufficient to establish guilt beyond a reasonable doubt. The *Richardson* Court held that retrial after a mistrial on account of a hung jury does not violate double jeopardy principles unless "there has been some event, such as an acquittal, which terminates the original jeopardy." 468 U.S. at 325, 104 S.Ct. at 3086. The Court stated:

> [W]e reaffirm the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like the defendant, is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree. Regardless of the sufficiency of the evidence at petitioner's first trial, he has no valid double jeopardy claim to prevent his retrial.

*Id.* at 326, 104 S.Ct. at 3086.

In any event, even if defendants would have been entitled to a judgment of acquittal upon a hung jury where the evidence was legally insufficient to support a verdict of guilty, or to double jeopardy protection in those circumstances, both forms of relief depend on the proposition that the evidence at the first trial was legally insufficient to support venue in the Southern District.

### B. Sufficiency as to Venue in the Southern District

■ With respect to a charge of conspiracy, venue may properly be laid in the district in which the conspiratorial agreement was formed or in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. *See* 18 U.S.C. § 3237(a); *United States v. Tannenbaum*, 934 F.2d 8, 12 (2d Cir.1991); *United States v. Ramirez–Amaya*, 812 F.2d 813, 816 (2d Cir.1987). Since venue is not an element of the offense, the government may prove venue by a preponderance of the evi-

**1542**

dence and need not prove it beyond a reasonable doubt. *United States v. Maldonado–Rivera*, 922 F.2d 934, 968 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991); *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir.1990); *United States v. Potamitis*, 739 F.2d 784, 791 (2d Cir.), *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984); *United States v. Jenkins*, 510 F.2d 495, 498 (2d Cir.1975). To establish a fact by a preponderance of the evidence means simply to prove that the fact is more likely true than not true. Thus, the evidence may well be sufficient to permit reasonable inferences that a given individual was more likely than not a member of the alleged conspiracy and performed a given act in furtherance of the conspiracy within the district of prosecution, thereby satisfying the venue requirement, even if the jury finds that same evidence not sufficiently persuasive to cause it, for purposes of assessing guilt, to draw those inferences beyond a reasonable doubt. *See, e.g., United States v. Friedman*, 998 F.2d 53, 57 (2d Cir.1993).

■ In reviewing any challenge to the sufficiency of the evidence, of course, we must view the evidence, both direct and circumstantial, in the light most favorable to the government and must credit every inference that could have been drawn in its favor. *See, e.g., Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Maldonado–Rivera*, 922 F.2d at 978; *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 134, 78 L.Ed.2d 128 (1983). The fact that a trier of fact has declined to draw one of two or more competing inferences does not mean that the inferences not drawn were not available or were not reasonable.

■ The government argues that venue was sufficiently proven in the Southern District because both the statements of Rosa and Fratta in their August 7 conversation with Rosen at the cafe in Manhattan and Fratta's August 16 conversation with Rosen at the club in Manhattan were acts in furtherance of the charged conspiracy. In opposition, defendants argue that those conversations related solely to stolen or counterfeit perfume, not to silver, watches, or other jewelry, which were the express subject of the conspiracy charged in the indictment. Given the above principles, and viewing the evidence in the light most favorable to the government, we reject defendants' interpretation and conclude that the evidence with respect to venue in the Southern District, though thin, was sufficient.

Although in the August 7 meeting among Rosa, Rosen, and Fratta in the Southern District, Rosa initially focused on "[a]ny kind of cologne, any that kind of stuff," later in that conversation he told Rosen, "No matter what it is give it to him. Bring it to Joe." Fratta chimed in, "[J]ust bring it to me and I gonna be responsible." A jury could reasonably have interpreted the statements of Rosa and Fratta, along with Rosa's phrase "[n]o matter what it is," as inviting Rosen to bring to a group of which Rosa and Fratta were members not just cologne but any kind of contraband, such as the supposedly stolen silver and jewelry the group eventually purchased. A jury also could reasonably have found such an interpretation supported by the conversation between Rosen and Fratta at the August 16 meeting in Manhattan. At that meeting, Rosen said he knew someone who could get "gold and diamonds," and Fratta responded: "It's swag, it's hot, swag gold. It's gotta be," and that "Pete may have somebody." A few days later, Rosa called Rosen and told him to take his source for gold and diamonds to Fratta. From these two meetings, a reasonable jury, if it drew all permissible inferences in favor of the government, could have found that it was more likely than not that Rosa and Fratta were members of the charged conspiracy to receive stolen silver, gold, and jewelry and that these Manhattan conversations were in furtherance of that conspiracy.

■ In sum, even if the Southern District jury was unable to reach agreement on the venue question, that inability is not dispositive. Since we could not properly have overturned a jury finding, if one had been forthcoming, that venue had been established in the Southern District, the evidence was legally sufficient to support venue in that district. Accordingly, the district court properly denied defendants' motions for acquittal and

did not abuse its discretion in declaring a mistrial and dismissing the Southern District prosecution without prejudice. The ensuing prosecution in the Eastern District did not violate defendants' rights to be free from double jeopardy.

## III. CHALLENGES TO THE MERITS

Defendants' challenges to the merits of their convictions include challenges to the sufficiency of the evidence, to the prosecutor's summation, and to the impartiality of the trial judge. None of their contentions has merit.

### A. *Sufficiency of the Evidence of Conspiracy To Violate § 2315*

Section 2315 provides, in pertinent part, as follows:

> Whoever receives, possesses, ... sells, or disposes of any goods, wares or merchandise ... of the value of $5,000 or more, ... which have crossed a State or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken ...
>
> ....
>
> Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 2315. Defendants contend that they were entitled to judgments of acquittal at the Eastern District trial on the ground that there was insufficient proof of the elements of § 2315. They argue (a) that there was no evidence that anyone other than Rosa knew or believed that the goods had traveled interstate, and (b) that there was no evidence that the goods they purchased or agreed to purchase were actually stolen. Because the interstate-or-foreign travel requirement in § 2315 is not a *mens rea* element but a jurisdictional element, and because defendants were not charged with violating § 2315 but rather with conspiring to violate it, their arguments lack merit.

 Conspiracy is a crime that is separate and distinct from the substantive offense that is the object of the conspiracy. *See, e.g., United States v. Feola,* 420 U.S. 671, 693, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975); *Callanan v. United States,* 364 U.S. 587, 593, 81 S.Ct. 321, 325, 5 L.Ed.2d 312 (1961); *United States v. Wallach,* 935 F.2d 445, 470 (2d Cir.1991). Because it is the conspiratorial agreement itself that is prohibited, the illegality does not depend on the actual achievement of the coconspirators' goal. *See, e.g., United States v. Wallach,* 935 F.2d at 470; *United States v. Goldberg,* 756 F.2d 949, 958 (2d Cir.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2706, 86 L.Ed.2d 721 (1985). Thus, a defendant may be convicted of the crime of conspiracy even if the substantive offense was not actually committed, and even if its commission was impossible because, for example, the key acts were to have been performed by agents of the government, *see, e.g., id.; United States v. Rose,* 590 F.2d 232, 235–36 (7th Cir.1978) ("*Rose* "), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979), or because an essential event did not come to pass, *see, e.g., United States v. Wallach,* 935 F.2d at 470, or because the coconspirators were mistaken in their view of the facts, *see, e.g., United States v. Waldron,* 590 F.2d 33, 34 (1st Cir.) ("*Waldron* "), *cert. denied,* 441 U.S. 934, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979). *See generally United States v. Giordano,* 693 F.2d 245, 249–50 (2d Cir.1982) (relying on *Rose* and *Waldron* ). What matters in a conspiracy prosecution is whether the defendants agreed to commit the underlying offense, not whether their conduct would actually have constituted that offense.

 Further, in order to prove a defendant guilty of conspiracy, the government need not show that he knew all of the details of the conspiracy, so long as he knew its general nature and extent. *See, e.g., Blumenthal v. United States,* 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947); *United States v. Labat,* 905 F.2d 18, 21 (2d Cir. 1990); *United States v. Alessi,* 638 F.2d 466, 473 (2d Cir.1980). Circumstantial evidence may be sufficient to prove conspiratorial intent, *see, e.g., United States v. Barnes,* 604 F.2d 121, 161–62 (2d Cir.1979), or the intent to commit the underlying substantive offense, *see, e.g., id.* at 156, or a particular defendant's knowing participation in the conspiracy, *see, e.g., United States v. Sanzo,* 673 F.2d

64, 69 (2d Cir.), *cert. denied,* 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982). A conviction for conspiracy must be upheld if there was evidence from which the jury could reasonably have inferred that the defendant knew of the conspiracy charged in the indictment and knowingly joined and participated in it. *See, e.g., United States v. Maldonado–Rivera,* 922 F.2d at 960; *United States v. Sanchez Solis,* 882 F.2d 693, 696 (2d Cir. 1989); *United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984).

With these principles in mind, we turn to the interstate travel and knowledge elements of conspiracy to deal in stolen property.

### 1. The Interstate Travel Element

 If the government has charged a defendant with the substantive offense of receiving stolen goods, it must prove that the goods had traveled interstate or across a United States border and that the defendant knew the goods were stolen. 18 U.S.C. § 2315. The interstate or foreign travel, however, while an element that must be proven, is merely the premise for federal jurisdiction. The government need not prove that the defendant had knowledge of that travel. *See, e.g., Godwin v. United States,* 687 F.2d 585, 588 (2d Cir.1982); *cf. United States v. Eisenberg,* 596 F.2d 522, 526 (2d Cir.) (knowledge of interstate transport not an element of 18 U.S.C. § 2314 (prohibiting interstate transport of stolen or counterfeit goods knowing the goods to have been stolen or counterfeit)), *cert. denied,* 444 U.S. 843, 100 S.Ct. 85, 62 L.Ed.2d 56 (1979); *United States v. Lothian,* 976 F.2d 1257, 1266 (9th Cir.1992) (same).

 When the charge is not the substantive offense but is instead conspiracy, there still must be some federal jurisdictional nexus; the question is what facts, physical or mental, will suffice to supply that nexus. In *United States v. Feola,* the Supreme Court considered a prosecution for conspiracy to violate 18 U.S.C. § 111, which prohibits assault on a federal officer, and explored both substantive conspiracy principles and jurisdiction principles with respect to whether the government was required to prove that the defendants knew their victims were federal

officers, *i.e.,* whether it was required to prove that the defendants had knowledge of the fact that gave rise to federal jurisdiction. The Court held that the government normally need not prove that the defendants knew their planned crimes were federal, for "it is clear that one may be guilty as a conspirator for acts the precise details of which one does not know at the time of the agreement," *United States v. Feola,* 420 U.S. at 692, 95 S.Ct. at 1268, and it is generally "totally irrelevant" to the purposes of conspiracy law "[t]hat individuals know that their planned joint venture violates federal as well as state law," *id.* at 693, 95 S.Ct. at 1268. The Court continued:

> "Indeed, unless imposition of an "antifederal" knowledge requirement serves social purposes external to the law of conspiracy of which we are unaware, its imposition here would serve only to make it more difficult to obtain convictions on charges of conspiracy, a policy with no apparent purpose."

*Id.* at 693–94, 95 S.Ct. at 1268. Noting that one of the purposes of conspiracy law is forestalling imminent crimes, the Court stated

> we do not see how imposition of a strict "antifederal" scienter requirement would relate to this purpose of conspiracy law. Given the level of intent needed to carry out the substantive offense, we fail to see how the agreement is any less blameworthy or constitutes less of a danger to society solely because the participants are unaware which body of law they intend to violate. Therefore, ... imposition of a requirement of knowledge of those facts that serve only to establish federal jurisdiction would render it more difficult to serve the policy behind the law of conspiracy without serving any other apparent social policy.

*Id.* at 694, 95 S.Ct. at 1268–69. The Court reasoned that "[t]he concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum," *id.* at 685, 95 S.Ct. at 1264, and that if the substantive offense does not require knowledge as to a given fact, "the

general federal conspiracy statute requires no more," *id.* at 692, 95 S.Ct. at 1267.

In *Feola*, though the defendants did not know it, the persons assaulted were in fact federal officers. Hence, the jurisdictional nexus was established, for "[t]he jurisdictional requirement is satisfied by the existence of facts tying the proscribed conduct to the area of federal concern delineated by the statute" notwithstanding defendants' lack of knowledge of those facts. *Id.* at 695, 95 S.Ct. at 1269. Nonetheless, the Court indicated that had an assault not been carried out or attempted, a specific belief on the part of the defendants that the intended victims were federal officers might be essential for the establishment of federal jurisdiction, in order to show that the conspiratorial agreement implicated an area of federal concern. *See generally id.* at 695–96, 95 S.Ct. at 1269. The court concluded that

> with the exception of the infrequent situation in which reference to the knowledge of the parties to an illegal agreement is necessary to establish the existence of federal jurisdiction, ... where knowledge of the facts giving rise to federal jurisdiction is not necessary for conviction of a substantive offense embodying a *mens rea* requirement, such knowledge is equally irrelevant to questions of responsibility for conspiracy to commit that offense.

*Id.* at 696, 95 S.Ct. at 1269.

In *Rose*, the Seventh Circuit considered a conviction under § 371 for conspiracy to violate 18 U.S.C. § 2314, which prohibits any person from transporting "in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen." The defendants had plotted to steal certain property in Arizona and to have it transported to Illinois; however, the persons they unwittingly recruited to commit the robbery and transport the property were government agents. Accordingly, neither the theft nor the interstate transportation of the property ever took place. The court rejected the argument that defendants could not be convicted unless "someone ha[d] stolen the goods the conspirators plan[ned] to

transport in interstate commerce," and upheld the convictions, stating as follows:

> Rose and Peterson intended to cause the goods to be stolen and then transported in interstate commerce with knowledge that they had been stolen. All that was necessary, in addition to an overt act, was that the intended future conduct they had agreed upon include all the elements of the substantive crime.

590 F.2d at 235.

In *Waldron*, the First Circuit considered a conviction under § 371 for conspiracy to violate both § 2314 and § 2315 where property was in fact transported in foreign commerce but, contrary to the defendant's belief, it had not been stolen. Based in Boston, the defendant and his coconspirators had planned to travel to Montreal in order to acquire what they believed were expensive stolen paintings. They went to Montreal and brought one such painting back to Boston; the painting, however, was not stolen but was a forgery, and indeed it was worth less than $5,000. Though the facts necessary for commission of the substantive offenses described in §§ 2314 and 2315 thus did not exist, the court upheld the conspiracy conviction, noting that the fact that the defendant was mistaken in his "assumptions and belief ... that the [painting was] authentic, stolen, and of great value" was not a defense to a charge of conspiracy:

> We see no reason, on this record, to back away from the principle that a culpable conspiracy may exist even though, because of the misapprehension of the conspirators as to certain facts, the substantive crime which is the object of the conspiracy may be impossible to commit.

590 F.2d at 34.

From *Feola*, *Rose*, and *Waldron*, it is plain that any of a variety of circumstances may suffice to supply the jurisdictional nexus for a federal prosecution for conspiracy to receive stolen goods. If the goods had in fact traveled interstate or across a United States border as stolen property, that would suffice despite the coconspirators' ignorance of that travel, since if, as in *Feola*, the acts performed or planned are clearly criminal, the coconspirators need not

have been aware of the crime's federal nature. Or the jurisdictional nexus for a conspiracy prosecution may be shown by evidence of the actual interstate or foreign transport of the goods even though, unbeknownst to the defendants, as in *Waldron*, the goods were not stolen. Or, even where there are no stolen goods and no actual interstate or foreign transport of any goods, the jurisdictional nexus may be supplied simply, as in *Rose*, by evidence that the defendants agreed to receive goods that they believed would be stolen and transported to them interstate.

In the present case, we conclude that the jurisdictional nexus was supplied in at least two ways. First, the goods that defendants purchased from Maniquis had in fact traveled from Washington, D.C. The jurisdictional nexus was thus satisfied whether or not the defendants knew of the interstate travel, for the essential nature of an agreement that violates the pertinent part of § 2315 is the simple agreement to receive stolen property; knowledge that the goods have traveled interstate or internationally is irrelevant to the essential nature of that agreement.

Second, since, in order to prove a given defendant guilty of conspiracy, the government need not show that he knew all of the details of the conspiracy so long as he knew its general nature and extent, a federal court would have jurisdiction to entertain the conspiracy prosecution if any of the members of the conspiracy to receive stolen goods believed the goods were traveling from outside the state, even if there was no such travel. Here, there was clear evidence that at least Rosa knew the goods the coconspirators bought and planned to buy were traveling interstate. For example, on one occasion, Rosen told Rosa that Maniquis had for sale jewelry that had come from Florida. On another, Rosa called Maniquis in New Jersey to reschedule a transfer of jewelry for that evening, and Maniquis said he would bring the jewelry back to Brooklyn. On September 29, Maniquis told Rosa that Maniquis had to meet with the silver source in New Jersey. And on October 7, Rosa told Maniquis that Czys would help transport the 680 pounds of silver coming from the New Jersey source, though he declined Maniquis's offer to have Czys to pick up the silver in New Jersey.

Although there was less evidence as to the interstate travel beliefs of the defendants other than Rosa, and the jury was instructed that in order to convict it must find that each defendant had such a belief, that instruction was unduly favorable to defendants and provides no basis for reversal. Since we have concluded that, even if the goods have not traveled interstate, the jurisdictional nexus may be satisfied by the belief of at least one coconspirator that the goods had traveled interstate, we need not explore the evidence of the other defendants' awareness that their crime was federal.

### 2. Mens Rea and the "Stolen" Property Element

Since § 2315 does include a *mens rea* element with respect to the status of the goods as having been stolen, 18 U.S.C. § 2315 (whoever receives stolen goods "knowing the same to have been stolen"), the government is required to prove defendants' mental state with respect to that status. *See, e.g., Feola*, 420 U.S. at 686, 95 S.Ct. at 1264–65. Because the charge was not the substantive violation of § 2315, however, the government was not required to prove that the goods were in fact stolen. The essence of the crime of conspiracy being the agreement, all that was necessary as to *mens rea* was proof of defendants' belief that the goods they conspired to purchase were stolen. *See, e.g., Rose*, 590 F.2d at 235; *Waldron*, 590 F.2d at 34. That evidence of that belief was sufficient with respect to each defendant.

As to Rosa, the proof was ample. The evidence included his expression of concern to Maniquis that the latter's source for the silver would, if caught, betray them to the authorities; Rosa's statement to Rosen that they could be in trouble if Maniquis was wired; the Rosa and Maniquis discussion of "warm" watches; and Rosa's statement that he was interested in purchasing stolen watches and jewelry. Further, on at least two occasions, Maniquis provided Rosa with

price lists that included Maniquis's estimate of the market value of jewelry and watches he was offering, together with his asking prices, which were just 10–20% of the market value estimates. The lists were properly admitted, over defendants' hearsay objections, not for the truth of the stated values, but to show that the disparity between stated value and asking price was so great as to create the inference that Rosa and his coconspirators surely believed they were dealing with stolen goods.

Further, there was ample evidence that Czys had joined the venture believing the group was dealing in stolen goods. For example, he had accompanied Rosa to the August 30 meeting, the occasion of Maniquis's first sale to Rosa, to assist Rosa. At that meeting, when there was some question as to price, Rosa told Czys to go to the car and get "the list." Czys appeared to know precisely what Rosa meant, as he did not ask "what list" but went immediately to the car to look for it. In the same meeting, when Maniquis was complaining about Rosa's choice of meeting place because of the presence of police in the area, Czys supported Rosa's choice with the suggestion that publicly performed acts carried a protective aura of legitimacy. On October 9, when Czys was arrested as he opened the door to Maniquis's truck, he immediately said, "That stuff doesn't belong to me. I'm only doing somebody a favor." The jury could easily have interpreted the swift volunteering of that statement as an indication of Czys's knowledge that "[t]hat stuff" was stolen.

There was also sufficient evidence that Lipson was a member of the conspiracy and knew the group was dealing in stolen goods. At the September 10 meeting of Rosa, Rosen, Maniquis and Lipson, for example, Rosa and Lipson examined one of Maniquis's price lists showing that the watches were being offered at 10–20% of their estimated market values. Lipson pointed out that "every one has a number on it, and every one has an owner." And when Rosa responded that the watches could not be sold in New York, Lipson said, "So, we, we'll take them out somewhere." Further, one of the transactions was to be consummated in Lipson's mother's apartment; and for another, Lipson offered the use of his van to transport silver bars to be purchased from Maniquis. In one transaction, Rosa had Rosen give him back $100 to give to Lipson.

Finally, the evidence was ample to permit the jury to infer that Shmariahu too knew he was dealing with stolen goods. First, when Rosa referred to his buyer (whom he described as a "thief" who was able to purchase and dispose of large quantities of stolen goods and who could produce $700,000 for a purchase on a day's notice) he meant Shmariahu. This was made plain, for example, on August 30, when Rosa said Czys would put the silver just purchased from Maniquis into the car of Rosa's buyer, and Czys and Shmariahu proceeded to load it into the car of Shmariahu. Further, in assuring Maniquis on September 10 that the watches would be sold outside of New York, Rosa said his buyer was "an Israeli guy"; when arrested, Shmariahu said he was from Israel. Shmariahu's knowledge that the goods in which he dealt were stolen was made evident on September 12, when, in Rosen's presence, he acid-tested the proffered watches, gave Rosa money to pay for them, and asked whether Rosen could be trusted. Further, when discussing the proposed 5,600–pound silver sale, Rosa explained to Maniquis that Shmariahu wanted to do the deal in stages because he did not want to chance having the authorities catch him with large quantities of silver before he could melt it down. And at the time of his arrest, Shmariahu denied having done any business with Rosa; since there was first-hand evidence that Shmariahu had paid Rosa for the watches, the jury could infer that Shmariahu's postarrest statement was a false statement that bespoke consciousness of guilt.

### B. *Other Arguments*

Defendants' other arguments include (1) Lipson's contentions (a) that the government should have been estopped from urging the jury to find that the conspiracy began in Brooklyn, and (b) that the jury should not have been allowed to consult transcripts of the tape-recorded conversations during its deliberations; (2) Czys's contention that

Judge Martin should have recused himself after the government decided to reindict defendants in the Eastern District; and (3) Shmariahu's contention that he was denied a fair trial by two aspects of the government's summation. These arguments do not require extended discussion.

■ Lipson's judicial estoppel argument is, essentially, that the government argued in defendants' first trial that the conspiracy had begun in the Southern District and that it should not have been allowed to argue in the second trial that the conspiracy began in the Eastern District. The government's positions were not inconsistent. Its theory was that defendants were members of a single conspiracy to receive stolen goods, and that some of the acts in furtherance of that conspiracy occurred in the Southern District though most occurred in the Eastern District. To the extent that defendants argued that the evidence showed the existence of not one conspiracy but several, the matter was a question of fact for the jury. *See, e.g., United States v. Orozco–Prada*, 732 F.2d 1076, 1086 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 155, 83 L.Ed.2d 92 (1984); *United States v. Bagaric*, 706 F.2d at 63 n. 18; *United States v. Alessi*, 638 F.2d at 472. The jury was properly instructed that the government was required to prove the existence of the conspiracy alleged in the indictment, and that if the jury found that there was more than one conspiracy it could not convict a given defendant unless it found that he was a member of the conspiracy alleged in the indictment. We see no error here.

■ We also reject Lipson's contention that the trial court improperly allowed the jury during deliberations to have tape-recording transcripts. The court, in its discretion, may allow the use of such transcripts if it instructs the jury clearly that the transcripts themselves are not evidence and may be used only as aids in listening to the audio tapes and as nonbinding guides that are subject to the jurors' own assessment of the transcripts' accuracy. *See, e.g., United States v. Doerr*, 886 F.2d 944, 966 (7th Cir. 1989); *cf. United States v. Ulerio*, 859 F.2d 1144, 1145 (2d Cir.1988) (no abuse of discretion in allowing jury to have transcripts of foreign-language tapes). The court in the present case allowed the jury to have transcripts in response to a request stating that "the bad quality" of the tapes made it difficult to interpret them. The court properly instructed the jury as to the limited use that could be made of the transcripts, and its decision to allow the jury to have them was not an abuse of discretion.

■ Czys's contention that Judge Martin should have recused himself is premised principally on the argument that, by raising the venue problem at the first trial and suggesting that there would be no such problem if the case were brought in the Eastern District, Judge Martin displayed partiality toward the government. Czys's arguments are frivolous. The raising of the venue issue at the first trial hardly evidenced partiality to the government; rather it pointed out a weakness in the government's case and spurred the defendants, who theretofore had not challenged venue, to move for acquittal principally on that ground. The record discloses no grounds on which Judge Martin should have recused himself.

Shmariahu's challenges to the prosecutor's summation, while somewhat more substantial, provide no basis for reversal. The focus was a copy of a receipt that Shmariahu introduced at trial to show that he was a businessman operating in good faith; the receipt, from a company with which he did business, was dated September 12 and showed the sale by Shmariahu of 2,500 ounces of silver, the same quantity that Rosa had purchased from Maniquis and delivered to Shmariahu on August 30. Shmariahu's counsel argued in summation that if Shmariahu had known the silver was supposedly stolen, he would not have held it for 13 days but would have resold it as quickly as possible. Shmariahu contends that the government's summation denied him a fair trial by arguing without supporting evidence (1) that the receipt was a fake and (2) that the market price of silver repeatedly declined between August 30 and September 12.

■ It is clear, of course, that it is improper for a prosecutor to mischaracterize the evidence or refer in summation to facts

not in evidence. *See, e.g., United States v. Richter,* 826 F.2d 206, 209 (2d Cir.1987). Such an impropriety is not ground for reversal, however, unless the remarks caused the defendant substantial prejudice. *See, e.g., United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985); *United States v. Rodriguez,* 968 F.2d 130, 142 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 139, 121 L.Ed.2d 92 (1992); *United States v. Nersesian,* 824 F.2d 1294, 1327 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Determination of whether there should be a reversal requires an evaluation of the severity of the misconduct, the curative measures taken, and the certainty of conviction absent the misconduct. *See, e.g., United States v. Friedman,* 909 F.2d 705, 709 (2d Cir.1990). The facts here do not reveal ground for reversal.

■ To the extent that the AUSA argued that the receipt introduced by Shmariahu was not a genuine reflection of an actual transaction, that argument was not an unfair response to the summation argument of Shmariahu's attorney. The receipt had been offered as a record kept in the ordinary course of the business of the company that did business with Shmariahu. The witness who provided the foundation for its admission as a business record was not the principal of the company, who would have had knowledge of the transaction itself, but rather a bookkeeper who had no such knowledge. Despite the witness's lack of knowledge, Shmariahu's attorney argued in his summation that the receipt was "legitimate." The AUSA argued that if it were indeed legitimate in the sense of accurately reflecting the facts of the transaction, Shmariahu would undoubtedly have produced the company's principal rather than a bookkeeper who knew nothing, and he argued that the jury should therefore infer that the receipt was a "fake." In light of this record, we are not inclined to view this part of the government's summation as improper.

■ The AUSA's reference to the movement of the price of silver is only somewhat more troublesome. The AUSA argued that during the period between the August 30 purchase and the September 12 date of the receipt, "the price of silver in this period is going down, down, down." The record, however, contained information only with respect to one day in that period, August 30. Thus, the prosecutor's statement seems to have overstated the record. Nonetheless, a simple argument that the price for silver was down, without a suggestion of a repeated or continued descent, would not have been improper. The evidence was that on August 28, Maniquis and Rosa had discussed a market price of $3.91 or $3.75; that on August 30, Rosa urged Rosen to find Maniquis quickly in order to conclude the then-pending silver transaction, "['c]ause the price is drop ... dropping" (ellipsis in original); and that the receipt introduced by Shmariahu dated September 12 showed a price of $3.48. Plainly, therefore, there was sufficient evidence that the price of silver had gone down. Indeed, Shmariahu's attorney, in his own summation, queried why Shmariahu would wait 13 days to sell the silver if he believed it had been stolen, querying whether it was because he was waiting for "the market" to "go back up"? The AUSA's argument that it was "going down, down, down" may have been an overstatement, but it surely was not an egregious one, nor one that likely had any material effect on the jury's evaluation of Shmariahu's knowledge or belief. Though the trial court did not give a curative instruction directed precisely at this overstatement, it did instruct the jury that the statements of the attorneys did not constitute evidence. In light of all the circumstances, we cannot conclude that the summation provides any ground for reversal.

## IV. CHALLENGES TO SENTENCING

In calculating defendants' sentences under the federal Sentencing Guidelines ("Guidelines"), the district court computed their offense levels pursuant to Guidelines § 2B1.1(b)(1) with reference to not only the value of the goods purchased but also the value of the planned but unconsummated purchase of 5,600 pounds of silver, an inclusion that increased their offense levels by two points. The court made further upward adjustments in the offense level of Shmariahu on the ground that he was in the business

of dealing in stolen goods, and in the offense level of Rosa on the grounds that he was in that business and that he was the leader or organizer of an extensive organization. In challenging their sentences, defendants contend principally that the 5,600 pounds of silver should not have been considered because the transaction was not reasonably foreseeable, or because it was not completed, or because there was "sentencing entrapment." They also challenge various other determinations. We reject all of their contentions.

### A. Consideration of the Proposed Deal for 5,600 Pounds of Silver

In determining the applicable offense level for a defendant convicted of conspiracy, the sentencing court is required to include any adjustments provided by the guideline applicable to the underlying substantive offense "for any intended offense conduct that can be established with reasonable certainty." Guidelines § 2X1.1(a). Further, each coconspirator is to be held responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Guidelines § 1B1.3(a)(1)(B). The district court's findings of fact with respect to these and other sentencing determinations are to be made by a preponderance of the evidence, see, e.g., United States v. Concepcion, 983 F.2d 369, 388 (2d Cir.1992), cert. denied, — U.S. —, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); United States v. Rodriguez–Gonzalez, 899 F.2d 177, 182 (2d Cir.), cert. denied, 498 U.S. 844, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990), and are not to be overturned unless they are clearly erroneous, 18 U.S.C. § 3742(e) (1988); see, e.g., United States v. Davis, 967 F.2d 84, 88–89 (2d Cir.), cert. denied, — U.S. —, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992); United States v. Vazzano, 906 F.2d 879, 883 (2d Cir.1990).

There was no clear error in the district court's determination that the coconspirators intended to purchase the 5,600 pounds of silver. Agreement for the purchase had been reached, and there had been extensive negotiations concerning the method and timing of delivery in order to honor Shmariahu's desire to avoid having more silver on hand than he could melt down quickly. Maniquis reported back that a staggered delivery schedule was agreeable to his source and that he would meet with the source to firm up amounts, for which Rosa urged him to arrange precise delivery dates.

Defendants' foreseeability arguments are also untenable. The 5,600–pound deal was discussed by Rosa and Lipson at a meeting with Rosen and Maniquis; Rosa thereafter reported to Maniquis Shmariahu's desire to do the deal in stages. Though the evidence was less direct with respect to Czys, there was evidence that he was familiar with Rosa's operations; that he knew the first transaction involved silver that was too heavy for him to carry alone; that Maniquis told him the October 9 transaction would involve even more silver; and that Rosa said he would fill Czys in on "the plan." The sentencing court found that it was "more probable than not" that Czys reasonably contemplated the larger scope of the conspiracy. We cannot conclude that that finding is clearly erroneous.

To the extent that defendants also argue that they were entitled to a three-step reduction in offense level under Guidelines 2X1.1(b)(2), which provides for such a reduction when a criminal defendant is convicted of conspiracy and the substantive offense was not committed, their argument ignores § 2X1.1(b)(2)'s explicit language. That section is inapplicable when the defendant or a coconspirator had

> completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond their control.

Id. The background commentary to Guidelines § 2X1.1 confirms that the three-step reduction is appropriate only if "the arrest occurs well before the defendant or any coconspirator has completed the acts necessary for the substantive offense." These defendants undoubtedly had completed all the acts

they believed necessary to conclude the substantive offense, *i.e.,* receiving goods they believed were stolen. The sentencing court's finding that only the October 9 and 10 arrests prevented completion of the 5,600–pound deal may not be overturned.

■■ Finally, we reject defendants' contention that the district court should have ignored the 5,600–pound deal on the ground that they were victims of "sentencing entrapment." This argument apparently posits that the government should have arrested defendants earlier, before they had an opportunity to enter into the 5,600–pound deal, and that the government improperly allowed matters to proceed simply in order to subject defendants to higher sentences. Even assuming the viability of the concept of "sentencing entrapment," *compare United States v. Lenfesty,* 923 F.2d 1293, 1300 (8th Cir.) ("[w]e are not prepared to say there is no such animal as 'sentencing entrapment'"), *cert. denied,* 499 U.S. 968, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991), *with United States v. Barnes,* 993 F.2d 680, 684 n. 2 (9th Cir.1993) (such a doctrine would be inappropriate), *and United States v. Williams,* 954 F.2d 668, 673 (11th Cir.1992) (same), *and United States v. Connell,* 960 F.2d 191, 194–97 (1st Cir.1992) (declining to fashion the doctrine on the facts before the court, and suggesting that in general such a doctrine would be inappropriate), such a defense would be inapplicable here. Even if we were prepared to suggest that the courts should inject their views into the government's exercise of discretion as to whether and when its investigation was sufficiently complete that it should have been terminated, we surely would not second-guess the government in the present case. The 5,600–pound deal was first discussed on September 10. Though Rosen had had a glimpse of Shmariahu earlier, transferring the first load of silver into Shmariahu's car, much of the evidence as to Shmariahu's role was developed later. For example, Rosen did not meet Shmariahu until September 12, when he observed Shmariahu testing the watches, paying Rosa for them, and inquiring as to whether Rosen could be trusted. Rosa's description of Shmariahu's ability and willingness to purchase hundreds of thousands of dollars worth of contraband at a time on a

day's notice did not occur until well after the 5,600–pound deal had first been discussed. Further, if such an entrapment defense were in theory viable, it would undoubtedly be vulnerable to a showing that the defendants were predisposed to engage in the further transactions, a predisposition plainly evident here.

In sum, even if defendants' sentencing-entrapment theory is doctrinally viable, it provides no basis for relief here.

### B. *Other Sentencing Contentions*

Defendants' other sentencing contentions include challenges by Rosa and Shmariahu to the four-level increases in their respective offense levels under Guidelines § 2B1.2(b)(4)(A) on the ground that they were "in the business" of receiving stolen goods; challenges by Lipson and Czys to the two-point increases in their respective offense levels pursuant to Guidelines § 2B1.2(b)(4)(B) on the ground that the offense involved "more than minimal planning"; and arguments by Rosa that his offense level should not have been raised on the premise that he was a leader of an extensive enterprise and should have been lowered because of his acceptance of responsibility.

■■ The record was ample to permit the court to infer that Rosa and Shmariahu were in the business of receiving stolen goods. Rosa, who sought to impress with his professionalism, indicated to Rosen that Rosen would be smart to bring his contraband to Rosa or Fratta in order to avoid being caught. On August 30, Rosa made clear that these were not his first such transactions, responding, when Maniquis complained about transferring the silver in an area so public as the restaurant parking lot, that Rosa had in the past used such public areas for transfers. *Cf. United States v. Esquivel,* 919 F.2d 957, 960–61 (5th Cir.1990) (in-the-business increase may be appropriate even if the defendant had never received stolen goods prior to the charged transactions). Rosa also revealed familiarity with the need to resell goods that bore serial numbers outside of New York, telling Maniquis that the people he dealt with were "professionals." Further,

numerous recorded conversations demonstrated that Rosa was willing to deal in a broad variety of stolen goods for resale; that Rosa had done similar deals in the past; that Shmariahu was willing and able to purchase large quantities of stolen goods; and that Shmariahu would provide Rosa with $700,000 for such a transaction on a day's notice. The court could reasonably infer from this evidence that Rosa and Shmariahu were "in the business" of reselling stolen goods.

■■■■ The challenges by Czys and Lipson to the more-than-minimal-planning enhancement are also meritless. Any contention that Czys and Lipson were not personally involved in the planning is immaterial. Such planning is an offense characteristic, not a characteristic of the individual defendant. *See* Guidelines § 2B1.2(b)(4)(B). The enhancement is appropriate whenever an offense involves "more planning than is typical for commission of the offense in a simple form [or] significant affirmative steps were taken to conceal the offense." *Id.* § 1B1.1, Application Note 1(f). This Application Note states that " '[m]ore than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." *Id.* In the present case, the numerous steps taken to conceal the offense, including the decision to melt all the silver and jewelry, the plan to obliterate the watches' serial numbers, and the discussion of shipping the goods outside New York, more than adequately demonstrated the requisite planning. Further, it is indisputable that the numerous individual transactions were not merely "opportune," as many of them were discussed and planned while another transaction was being consummated.

■■■■ We also reject Rosa's contention that he was entitled to a two-step reduction in offense level for acceptance of responsibility. The sentencing court is particularly well-suited to determine whether such a reduction is appropriate, *see* Guidelines § 3E1.1, Application Note 5, and the determination that a defendant has not adequately accepted responsibility is entitled to great deference on review, *id.*; *United States v. Olvera*, 954 F.2d 788, 793 (2d Cir.), *cert. denied,* ── U.S.

──, 112 S.Ct. 3011, 120 L.Ed.2d 885 (1992); *United States v. Woods,* 927 F.2d 735, 735 (2d Cir.1991). Without determining whether a defendant who claims "sentencing entrapment" may ever receive the two-point reduction, *compare United States v. Emenogha,* 1 F.3d 473, 482 (7th Cir.1993) (entrapment defense bars receipt of acceptance-of-responsibility reduction), *cert. denied,* ── U.S. ──, 114 S.Ct. 901, 127 L.Ed.2d 92 (1994), *with United States v. Fleener,* 900 F.2d 914, 918 (6th Cir.1990) (entrapment defense not an "absolute bar" to receipt of reduction), *and United States v. Demes,* 941 F.2d 220, 222 (3d Cir.) ("claim of entrapment at trial seems to be the antithesis of the acceptance of responsibility"), *cert. denied,* ── U.S. ──, 112 S.Ct. 399, 116 L.Ed.2d 348 (1991), we conclude that nothing in the record suggests that the district court improperly determined that Rosa was not entitled to such a reduction.

■■■■ Finally, Rosa's contention that his offense level should not have been increased by four steps pursuant to Guidelines § 3B1.1 on the ground that he was a leader or organizer of "a criminal activity that involved five or more participants or was otherwise extensive" has greater appeal but must eventually fail under the applicable standard of review. The district court found that "the proof clearly shows this is an otherwise extensive organization...." The record showed, *inter alia,* that Rosa had recruited Czys, gave him instructions, and kept him informed of the conspiratorial plans; that Rosa ensured that Rosen provided money to give to Lipson; and notwithstanding the jury's acquittal of Fratta, the court was entitled to view Fratta too as one of Rosa's assistants who would accept stolen goods and meet Rosen's sources as directed by Rosa. Rosa also apparently had a sufficiently large organization to permit him to deal in a variety of contraband goods. He initially said he could handle counterfeit perfumes. He next sought to meet Rosen's supposed source for gold and diamonds. He later said he would also deal in electronic equipment. He said his buyer could handle any quantity of stolen jewelry, gold, or silver bars, and could provide $700,000 on a day's notice, and said he

dealt with professionals. We conclude that the district court's finding was not clearly erroneous.

## CONCLUSION

We have considered all of defendants' contentions on these appeals and have found them to be without merit. The judgments of conviction are affirmed.